**INTERNATIONAL ELECTION SYSTEMS CORPORATION, Plaintiff,**

v.

**Ransom F. SHOUP, Ransom F. Shoup, II, Ransom F. Shoup & Co., Inc., and Election Services and Supplies, Inc.**

**Civ. A. No. 73–756.**

United States District Court, E. D. Pennsylvania.

April 24, 1978.

James A. Drobile, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Edward A. Meilman, Sidney G. Faber, Ostrolenk, Faber, Gerb & Soffen, New York City, for plaintiff.

Stephen R. Bolden, Fell, Spalding, Goff & Rubin, Philadelphia, Pa., Richard E. Kurtz, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

Plaintiff and defendants are competitors engaged in the business of selling and servicing voting machines and accessory parts therefor. On March 30, 1973, plaintiff, International Election Systems Corporation (IES), instituted this action alleging that

defendant Ransom F. Shoup had fraudulently entered into a contract with Computer Election Systems, Inc., an exclusive sales agent for IES, with the intent to defraud plaintiff and with the intent to compete with plaintiff; and that defendants had infringed United States Letters Patent Nos. 2,953,296, 3,170,623, 3,312,390, and 3,436,011; had engaged in unfair competition by, among other things, taking and unlawfully using trade secrets owned by plaintiff, by falsely representing themselves to be associated with the Shoup Voting Machine Corporation, a wholly owned subsidiary of the parent corporation of IES, and by use of identical trade dress; had unlawfully converted plaintiff's property to their own use; and had infringed plaintiff's trademark by use of the name "Shoup." Defendants filed an answer denying each of these assertions and counterclaiming for damages for royalties pursuant to the agreement of September 22, 1975, between Ransom F. Shoup and the plaintiff's predecessor, The Shoup Voting Machine Corporation of New York; for failure to pay commissions; for trade libel and defamation; for antitrust violations; and for interference with contractual relationships. The defendants have dropped their counterclaim concerning the payment of commissions.

On November 12, 1973, I heard testimony and argument on the defendants' Motion for a Preliminary Injunction and Motion to Dismiss for Failure to Join an Indispensable Party or in the Alternative for Compulsory Joinder. I denied the request for a preliminary injunction because there was no showing that the acts complained of were in fact occurring or were likely to continue in the future. The Motion to Dismiss or for Compulsory Joinder was also denied in view of the concession by plaintiff's counsel that the plaintiff is the record owner of the patents in question and is bound by whatever royalty agreements there might be.

The issues surrounding the execution, continued force, effect, and meaning of the

employment contract of September 22, 1955, were severed from the other issues, and that phase of the case was heard by me without a jury on July 1, 2 and 3, 1975. The remaining issues were tried before me on August 4, 5, 6, 7 and 8, 1975.

On July 3, 1975, after completion of the evidence on the employment contract issues, I stated on the record my Findings of Fact and Conclusions of Law concerning those issues. I hereby expressly adopt those Findings of Fact and Conclusions of Law, and will repeat them here only insofar as it is necessary to lay a basis for the discussion of related issues.

In order to expedite the trial of all issues, counsel were directed to file a pretrial order in which all undisputed facts were set forth and stipulated to. The parties were able to stipulate to the issues relating to the general background of the case; the written employment agreement dated September 22, 1955; the alleged breach by Ransom F. Shoup of his contract with Computer Election Systems, Inc.; the patent infringement issues; the unfair competition issues relating to the taking of proprietary information; the conversion issue; and the use of the name and trademark "Shoup." Stipulations were also reached concerning the counterclaims for royalties and for commissions. Counsel were unable to agree on a joint statement of uncontested facts for the counterclaims alleging defamation and trade libel, anti-trust violations, and interferences with contractual relationships.

All evidence on damages was to be presented at the trial on liability, with the exception that no evidence would be presented at that time on the damages from the alleged patent infringement.

The Final Pretrial Order was filed with the Court on May 14, 1975.[1] I hereby expressly adopt the stipulated facts set forth therein, and where they are relevant to the issues determined herein, I will set them forth as Findings of Fact.

---

1. An earlier Final Pretrial Order was filed by counsel on April 15, 1975. It did not comply with the directions of this Court, and counsel were directed to draft another order. The pretrial order filed on May 14, 1975, superseded the earlier order, and all references in this Opinion to the Final Pretrial Order refer to the one filed on May 14, 1975.

I make the following Findings of Fact and Conclusions of Law.

## BACKGROUND

1. Samuel R. Shoup, the father of defendant Ransom F. Shoup, organized the Shoup Voting Machine Corporation of New Jersey *circa* 1905. The defendant Ransom F. Shoup joined him in that voting machine business in 1925. That New Jersey company issued a manufacturing license to a firm which, in June 1954, incorporated as the Shoup Voting Machine Corporation of New York.

2. Ransom F. Shoup was an employee of the Shoup Voting Machine Corporation of New York; he was discharged from his employment with that corporation in May 1955.

3. The voting machines being sold at that time were called "2.5" machines. The "2.5" designation represented the width in inches between the centers of the vertical voting machine columns.

4. The primary activities of the defendant throughout the entire period in issue related to the development and perfection of voting machines and to receiving adequate compensation for his efforts and ingenuity in that regard.

5. Prior to his discharge, Mr. Shoup was actively engaged in developing a "3.2" voting machine. That machine has 3.2 inches between the centers of its vertical voting machine columns.

6. Subsequent to his discharge in May 1955, Ransom F. Shoup proceeded with great vigor to continue the development of the 3.2 machine and various improvements related thereto.

7. Mr. Shoup was re-employed by the SVMC in the fall of 1955, by an agreement dated September 22, 1955 (Exhibit D–1). That contract assured the employer of Shoup's continued services for sales and development and at the same time guaranteed against any competition from Mr. Shoup or companies with which he might otherwise have been associated. These benefits were assured to the company as long as it wanted them; it was only if the company severed the employment relationship that Mr. Shoup would have been able to go into competition with the employer and would have had the right to use the patent for the 3.2 machine. The contract also cleared up any obscurity that may have existed with respect to the company's rights to use the 3.2 machine and patents and improvements related thereto, and, of course, assured them of the exclusive right to use any subsequent patents or improvements.

8. In 1961, the Shoup Voting Machine Corporation of New York, by whom Mr. Shoup was employed, was sold to and became a subsidiary of General Battery & Ceramic Corporation.

9. The September 22, 1955 agreement was modified by a letter agreement dated August 4, 1965 (Exhibit D–3). The purpose of that agreement was to reduce to writing the terms and conditions of Mr. Shoup's commission arrangement with the Shoup Voting Machine Corporation as a subsidiary of General Battery & Ceramic Corporation. The modifications contained in this agreement are not inconsistent with the continued existence of the 1955 contract, for the latter dealt only with granting commissions in lieu of bonuses and did not purport to be an entirely new employment contract.

10. In August 1965, the Warden Corporation, a Pennsylvania corporation, purchased the Shoup Voting Machine Corporation of New York. In September 1965, the Warden Corporation changed its name to the Shoup Voting Machine Corporation (SVMC). That corporation was a Pennsylvania corporation.

11. In the fall of 1967, Joseph C. Lepanto, Esq., counsel for stockholders of plaintiff's predecessor, was asked to prepare a new employment contract between Ransom F. Shoup and the Shoup Voting Machine Corporation. Mr. Lepanto did prepare a contract bearing a date of November 1, 1967 (Exhibit D–4); that contract was never signed by either party.

12. The terms of the 1967 proposed new contract and the circumstances surrounding

its drafting clearly recognized the continued existence of the 1955 contract as of that time.

13. On July 14, 1969, the Macrodyne-Chatillon Corporation (Macrodyne) purchased all of the stock of the SVMC.

14. In the written "Agreement and Plan of Reorganization," which memorialized the Macrodyne transaction, the selling stockholders stated that Ransom F. Shoup was employed under an oral year-to-year employment contract. It is important to note that defendant Ransom F. Shoup was neither a stockholder nor director of the SVMC at any time. It is obvious that Mr. Shoup himself was never consulted with respect to that transaction or with respect to any representations which may have been made in connection with it. It is also clear that Mr. Shoup had no knowledge of the details of the transaction, was not a participant in any of the negotiations, and had no knowledge of the representations which were made in connection with that transaction.

15. I find that at no time between 1955 and the spring of 1972 did the circumstances impose upon Mr. Shoup any obligation to speak up and assert the existence of the 1955 contract, as amended in later years, or to call it to anyone's attention.

16. Approximately three years prior to the purchase of the SVMC by Macrodyne, five employees of the SVMC were indicted on charges of conspiracy and other criminal charges connected with the selling of voting machines. None of the parties to the instant litigation had any knowledge of or involvement in the actions underlying those criminal charges. The publicity resulting from these indictments, however, and from the subsequent nolo contendere pleas of the employees, virtually halted all sales of voting machines by the SVMC. In 1971 and 1972, the SVMC experienced severe economic hardships due to these legal and tax problems.

17. Mr. Shoup's son, defendant Ransom F. Shoup, II, was appointed as president of the SVMC in 1971.

18. In January and February 1972, Ransom F. Shoup was hospitalized and treated for kidney ailments; during this period of time he also underwent kidney surgery.

19. On February 11, 1972, Albert J. Benning, acting on behalf of the SVMC, gave to defendant Ransom F. Shoup II, a notice (Exhibit P–9 and Exhibit C to the Answer) stating that defendant Ransom F. Shoup would be "retired" as of the end of April 1972. At this time, Ransom F. Shoup II, as president of the SVMC, reported to and was under the control of Albert J. Benning. (Deposition of Albert J. Benning, August 23, 1974.) Mr. Benning and other officials of the SVMC were aware of Ransom F. Shoup's hospitalization, and Ransom F. Shoup II was instructed to inform his father of the action only at such time as he felt it was appropriate in view of his father's physical condition.

20. Ransom F. Shoup learned of his impending termination from his son while he was still in the hospital; he was given a copy of the written notice relating to the termination on February 16, 1972.

21. Upon learning of the impending termination, Ransom F. Shoup began to contact prospective customers by telephone from his hospital bed.

22. I find that the severance of Mr. Shoup's employment in February 1972 was involuntary. Not only do all of the surrounding circumstances mandate that conclusion, but I find specifically that the company had no retirement program and, therefore, when they used the word "retiring" Mr. Shoup, they meant, in effect, discharging him without any further compensation. I find that the termination occurred on February 11, 1972.

23. For the reasons set forth more fully in the transcript of July 3, 1975, pp. 3–8, 3–9, I find that Mr. Shoup had not breached the contract as of the date of his discharge in February 1972. More specifically, I find that neither his activities while hospitalized nor his ordering of the interlock die, which occurred in January 1972, is contrary to this finding.

24. On February 28, 1972, defendant "Ransom F. Shoup & Co., Inc.," was incorporated in Pennsylvania by the defendant Ransom F. Shoup. Some time prior to September 1955, Mr. Shoup had previously registered in Pennsylvania the fictitious name "Ransom F. Shoup & Company;" he continued to use that name throughout the ensuing period. On November 30, 1972, defendant Ransom F. Shoup & Co., Inc., registered in Pennsylvania the fictitious trade name "R. F. Shoup Corporation."

25. At a February 29, 1972 special meeting, Macrodyne, the sole stockholder of the SVMC, approved the sale to Macrodyne of all rights, title and claims to all patents, patent rights, designs, developments, blueprints, drawings, engineering and production data, tools, dies, molds and special manufacturing equipment with complete rights to manufacture and sell voting machines, election equipment, accessories, parts and supplies and all other items applicable to rights held by the SVMC, including the use of the "Shoup" name, in return for cancellation in excess of $585,000 of a debt owing to Macrodyne by the SVMC and assumption by Mycrodyne of all royalty payments and warranty commitments then in effect. The sale was effected on February 29, 1972.

26. On March 6, 1972, defendant Ransom F. Shoup sent a letter to the SVMC stating that he had been informed his employment was terminated, and that he had secured other employment; he returned a salary check that had been issued to him for the month of March. The memorandum of February 11, 1972, had stated that he would be retained and paid through the end of April 1972.

27. Macrodyne organized plaintiff International Election Systems corporation, and on March 15, 1972, Macrodyne conveyed everything it had purchased from the SVMC to IES. In return, IES assumed all of the warranty commitments and royalty payments assumed by Macrodyne and conveyed all of its outstanding stock to Macrodyne.

28. In a letter dated March 18, 1972, Mr. Shoup's attorney sent to IES and Macrodyne a copy of the September 22, 1955 employment contract.

29. I find that as of March 18, 1972, the employment contract of September 22, 1955, as modified by the interim commission arrangements, was in effect.

30. I find that the employer, under whatever name it happened to be operating at the time, is equivalent to the plaintiff in this action; in short, I find that the plaintiff stands in the same position as the corporation or the employer in the September 22, 1955 contract.

31. In consequence, as of March 18, 1972, Mr. Shoup became entitled to a $10 royalty per machine sold by IES, but only for the period when Mr. Shoup was not in competition with the plaintiff. Furthermore, I conclude that the $10 royalty payment covers only such period during which the plaintiff had the exclusive right to use the patent. During any period in which the defendant himself was making use of the patent for his own purposes, the $10 royalty does not apply.

32. I conclude further that as of March 18, 1972, Ransom F. Shoup had the right during his lifetime to use the patents covered by the agreement.

33. Defendant Ransom F. Shoup is, in effect, equivalent to the R. F. Shoup Corporation and Ransom F. Shoup & Co., Inc., and each of them is his alter ego for the purpose of using the patents. Defendant Ransom F. Shoup II, as an employee of the defendant corporations, also had the right to use the patents.

34. The right of Mr. Shoup, as well as the right of each of the other defendants, to use the patents expired with the demise of Mr. Shoup on August 18, 1977.

## BREACH OF CES CONTRACT

35. On March 19, 1972, IES contracted with an independent voting product sales organization, Computer Election Systems, Inc. (CES), for distribution and service of "Shoup products" for the remainder of the

year 1972. "Shoup products" were defined by the contract to mean "all voting machines, election equipment, accessories, supplies, demonstration media and other parts previously marketed by The Shoup Voting Machine Corporation and all subsequent modifications and additions thereto." (Exhibit D–22, ¶ 1, § 1.1.)

36. It was common knowledge in the industry at the time IES signed this contract that CES was involved in a punched card type voting system, and that CES was a leader in that industry.

37. Prior to March 19, 1972, Election Equipment Corporation had been the exclusive sales agent for IES. Its contract was terminated in January 1972.

38. Paragraph 12 of the IES–CES contract provided that CES may employ Ransom F. Shoup, Sr., Ransom F. Shoup II, or any other Shoup employee with the exception of David W. Deufel. Paragraph 12 of that contract further provided that if Ransom F. Shoup, Sr. were to be employed by CES, such employment was to be restricted to his providing sales and marketing services for CES; in the event that Mr. Shoup developed any products applicable to the Shoup product line or any improvements or modifications thereof, all rights were to be assigned to IES pursuant to an agreement that was to be entered into between Mr. Shoup, CES and IES. That three-party agreement was to provide that IES would reimburse CES, on a monthly basis, for 50% of the compensation paid to Mr. Shoup.

39. There is no evidence Ransom F. Shoup knew of the terms of the IES–CES contract; specifically, there is no evidence that Ransom F. Shoup knew that IES was to pay 50% of his salary.

40. One or more members of plaintiff corporation actively encouraged Mr. Shoup and his son to go to work for CES.

41. By an agreement dated April 26, 1972, between Ransom F. Shoup and CES, Ransom F. Shoup was employed by CES. There is uncontradicted testimony by Mr. Shoup that he did not in fact sign that agreement until some five days after it was dated.

42. The contract recited that CES had contracted to act as the exclusive sales agent for the sale of Shoup voting machines and that CES was desirous of retaining Shoup as a consultant in the field of voting machines and other election equipment problems. Mr. Shoup was retained by that contract as a consultant; his consultation work was to be principally in the field of voting machine service, ballot layout and design, education and instruction (Exhibit P–11).

43. The Shoup-CES contract expressly states that Ransom F. Shoup & Co., Inc., is intended to be a third-party contract beneficiary of ¶ 9 of the contract; ¶ 9 gives to Ransom F. Shoup & Co., Inc. the right of first refusal for the performance of service, repair or ballot set-up work.

44. Paragraph 13 of the Shoup-CES contract contains a restrictive covenant, in which Mr. Shoup agreed that for a period of two years following the termination of the CES contract he would not throughout the United States, either directly or indirectly, alone or as a member of a partnership, be engaged in or concerned with the sale, manufacture or distribution of voting machines, voting devices, or accessory mechanisms for use in state, federal or local elections. The restriction was subject to the condition that the restriction would not apply to Mr. Shoup if CES terminated the agreement prior to the expiration of its five-year term on March 31, 1977, or if CES caused or brought about a termination of that agreement prior to such date by reason of the fact that it committed one or more material breaches of the terms of said agreement. The restriction was to apply if Mr. Shoup terminated the agreement prior to its expiration date.

45. With 30 days advance notice to CES, Mr. Shoup terminated the CES agreement effective September 1, 1972, alleging material breaches by CES of the agreement.

46. On October 20, 1972, the IES–CES contract was amended to terminate the exclusive sales agreement with CES; while parts of that agreement were modified or

kept in force, they are not relevant here. The amendatory contract granted to IES the immediate right to engage in the marketing of Shoup products on its own behalf (Exhibit D–23).

47. CES is not a party to this litigation, and there is no ownership relationship between CES and any of the parties herein.

48. While Mr. Matarese, president and chief executive officer of Macrodyne Industries, believed that the Shoup-CES agreement was for the benefit of IES, IES was not a signatory to that contract, the three-party agreement between Mr. Shoup, CES, and IES, contemplated by the IES–CES contract, was never entered into, and there is no evidence in the record that Mr. Shoup was ever advised that his agreement with CES was for the benefit of IES. Furthermore, the inclusion in the Shoup-CES contract of an express "intended beneficiary" clause on behalf of Ransom F. Shoup & Co., Inc., demonstrates that the parties were able to so provide when it was their intention to benefit a third party. The Shoup-CES contract contains no such third-party beneficiary clause for the benefit of IES.

49. Therefore, notwithstanding the fact that IES did reimburse CES for 50% of Mr. Shoup's salary pursuant to the IES–CES contract, I conclude that IES was not an intended third-party beneficiary of the Shoup-CES contract, and that IES cannot enforce the restrictive covenant contained in that agreement. In accordance with this finding, it is unnecessary for me to resolve whether in fact CES had materially breached the Shoup-CES contract.

50. In short, I reaffirm my earlier tentative finding that nothing involved in the arrangements between Mr. Shoup and CES or between the plaintiff and CES would give rise to a cause of action as between plaintiff and defendant with regard to that transaction, and that insofar as this case is concerned, none of the defendants are restricted from competing with the plaintiff. (Transcript of 8/8/75, pp. 8–69, 8–70.)

51. In the alternative, assuming *arguendo* that IES was an intended beneficiary of the Shoup-CES contract, I must decide what benefit IES was entitled to as a result of that relationship. There is little evidence in this regard. I emphasize that at the time Mr. Shoup entered his contract with CES he was not an employee of IES. I note that in the 1955 agreement between Ransom F. Shoup and the predecessor to IES, Mr. Shoup agreed to "devote his best efforts and his entire business time as an officer, consultant and otherwise," to his employer, but only as required or requested by his Employer; he was to assist in the solicitation of orders and to promote the sale of his employer's voting machines, but again only as directed to do so by the employer. In contrast, the CES contract employed Mr. Shoup solely as a consultant, with no requirement that he devote his full time to it and with no requirement that he solicit the sale of voting machines. The CES contract is silent as to whether Mr. Shoup may solicit voting machine business for his own company. I earlier found that despite evidence that Mr. Shoup had solicited work for himself while employed by IES, there was no evidence that he failed to do anything that the company wanted him to do or that the company objected to whatever outside activities he may have had over the years. N.T. 3–8.

52. In March and April 1972, IES actively encouraged Ransom F. Shoup II, then president of SVMC, to join CES.

53. Ransom F. Shoup II joined CES on May 1, 1972, as a vice-president of that company.

54. At the request of Mr. Benning and of Mr. Matarese, when Ransom F. Shoup II joined CES, he took with him documents from the files of the SVMC. Ransom F. Shoup II made copies of each of these files for his own use as a liaison between CES and IES.

55. While it is stipulated that Messrs. Shoup and Shoup II knew, prior to their entering into their relationship with CES, that CES was involved with computerized voting systems, I find that it was in July 1972 that Ransom F. Shoup II was first informed that CES had plans for him to

cease all efforts to sell voting machines and to instead use his efforts to sell punch-cards for the CES computerized voting system; I find that he determined at that time or shortly thereafter to leave CES.

56. With an advance notice of 30 days, Ransom F. Shoup II terminated his relationship with CES on September 1, 1972.

57. In support of its theory that the defendants intended to defraud IES, when they entered their CES contracts, plaintiff points to the ordering of an interlock die by Ransom F. Shoup in January 1972. I have earlier ruled that the ordering of this die was not inconsistent with the absence of a breach by Mr. Shoup of his 1955 agreement. I further found that at the time Mr. Shoup ordered the die, the relations between Mr. Shoup and the company were becoming strained and that the ordering of the die was done with an eye to a possible termination of the 1955 agreement. Assuming the facts most strongly in favor of the plaintiff, I found that even if Mr. Shoup had ordered this die without any intention of having IES obtain the benefit of it, that would not amount in and of itself to a breach of the agreement. I further stated that the agreement would be breached only if Mr. Shoup used the die to manufacture parts while he was still employed by the plaintiff, and the evidence is quite clear that nothing was done with that die until after the employment contract had already been breached by the company.

58. In view of these former findings, and in view of the fact that the IES–CES contract was not entered until some three months after the ordering of the die, and that the Shoup-CES contract was not entered until one month thereafter, in April 1972, I find it implausible that in January 1972 Mr. Shoup intended to set in motion a scheme ultimately to defraud IES. There is no evidence in the record that Mr. Shoup knew of the contemplated relationship between IES and CES prior to its consummation, and although it is likely, due to his relationship with Ransom F. Shoup II, that he became aware of that impending transaction prior to March 19, 1972, I cannot conclude that he further foresaw his own future employment with CES, much less an opportunity through that employment to take advantage of IES.

59. There is evidence in the record, albeit jumbled and scant, concerning the solicitation of bids by Mr. Shoup on behalf of himself and Ransom F. Shoup & Co., Inc. during the period of time subsequent to his termination by IES and up to and including the first month of his employment by CES. I find that Mr. Shoup's contracts with the City of St. Louis, Missouri, and the County of Jackson, Missouri, were made before Mr. Shoup began his employment by CES, and that he informed CES of those contracts. I find that, while the record contains an invoice dated April 28, 1972, for supplemental interlocks supplied to Malden, Massachusetts, by the defendant Ransom F. Shoup & Co., Inc., the record contains no evidence as to the date on which that job was solicited or completed. Similarly, while allusions are made to a contract Mr. Shoup solicited for the City of Chicago, Illinois, there is no evidence as to the specific date on which that job was solicited. I can make no finding with regard to these two contracts, nor can I speculate as to why they are not acknowledged in the CES contract.

60. In further support of its intent to defraud theory, plaintiff alleges that Ransom F. Shoup developed a prototype voting machine while employed by CES, and with the aid of IES drawings and technical documents.

61. I find that Fred H. Hoffken, president of Essington Metal Works and owner of Ridley Manufacturing Company, was asked by Ransom F. Shoup in July 1972 to assist him in the production of a prototype voting machine.

62. The prototype was to be of a "union election" voting machine, to be used in union or church elections where either the number of candidates or issues is relatively small in comparison to public sector elections. Thus, the machine as developed had five columns and was 20 rows deep; a typical voting machine today has 10 columns and 35–40 rows.

63. Mr. Hoffken's records reveal, contrary to the testimony of Mr. Shoup, that work began on this prototype union voting machine on July 13, 1972, and was completed in August 11, 1972.

64. I find that as a result of a visit by election officials from the State of Louisiana in October 1972, Mr. Shoup was requested to attempt to develop a larger version of the union election voting machine. These officials desired the larger machine to have the same benefits of the smaller machine, to wit, lighter weight, more maneuverability, and easier storage.

65. I find that the prototype of the larger machine was completed some time in December 1972, and was the result of a continuation of the development of the union election machine, so that it was not improbable that the prototype of the larger machine could have been completed between the months of October and December 1972.

66. In October 1972, Ransom F. Shoup II met with David W. Deufel in an attempt to persuade Mr. Deufel to go to work for the defendant corporations. At that time, Mr. Deufel was employed by Macrodyne.

67. On the same day that Mr. Deufel and Ransom F. Shoup II met, Mr. Deufel was shown the prototype of the union election voting machine. If, as Mr. Deufel stated in his deposition on August 16, 1973, at page 72, he also saw the larger version of the machine (the machine now produced by defendants), I am satisfied that what he saw at that time was not the completed prototype of the larger machine, but rather was a partial assembly of the "guts" of that machine, consistent with his testimony of August 7, 1975, at pp. 7–28 through 7–29. In short, I find that whatever the stage of assembly of the prototype of the larger machine seen by Mr. Deufel on his October 1972 visit, it was short of completion.

68. I now turn my attention to the final issue concerning the alleged breach by the Shoups of their respective contracts with CES. It involves the award by the State of Louisiana of a contract for 312, 10-column, 25-row 3.2 machines to Election Services & Supplies, Inc., a defendant corporation.[2]

69. Prior to December 1972, no company in the voting machine business had yet made a 10-column, 25-row 3.2 machine.

70. On the basis of the bid submitted by defendant Election Services & Supplies, Inc., the State of Louisiana awarded the contract to that company. (Exhibit P–89–A.) Photographs of the prototype of the machine that defendants had developed for the purpose of bidding in the State of Louisiana accompanied their bid. The defendants' bid was submitted on December 12, 1972.

71. Fred Hoffken, owner of Essington Metal Works and Ridley Manufacturing Company, was engaged by Ransom F. Shoup to manufacture the machines to be supplied to the State of Louisiana. The assembly of those machines began on May 21, 1973, and delivery began some time in late July 1973.

72. While it appears that the counter shifter plate of the machines manufactured by Hoffken for the Louisiana contract were made by Sedgley Metal Company with a die owned by IES, I find that the acts of neither Fred Hoffken nor Sedgley Metal are attributable to the defendants. If the use of the die was wrongful, defendants are not responsible, there being no evidence that they directed Mr. Hoffken or Sedgley Metal to use such die, or that they knew Mr. Hoffken had ordered the counter shifter plates from Sedgley.

73. In sum, there is no basis for concluding that the defendants entered their re-

---

**2.** Ransom F. Shoup testified that he incorporated Election Services & Supplies, Inc., on October 3, 1972, so that he could avoid using the name Shoup when he submitted a bid to the State of Louisiana where the name Shoup was in disrepute. The only explanation given was that "Louisiana had sort of a disturbing experi-

ence having bought things from the combination Shoup Voting Machine-Macrodyne Company." N.T. 6–20. In his deposition testimony of August 15, 1973, Mr. Shoup cited the indictment of former Shoup officials as the cause of distrust by Louisiana officials of the name "Shoup." Transcript of 8/15/73, pp. 198–99.

spective CES contracts with intent to defraud IES, or that the defendants breached their respective CES contracts.

74. Having assumed, *arguendo,* that IES was a beneficiary of the Shoup-CES contract, it is clear that the rights of IES are derivative from that agreement; the termination of the Shoup-CES agreement terminated all rights of IES to enforce that agreement. This brings into focus the effect of the restrictive covenant in the Shoup-CES contract.

■ Was IES an intended beneficiary of the Shoup-CES contract insofar as it purported to restrict Mr. Shoup's ability to compete with CES should he leave CES on his own accord? I think not. First, the IES–CES contract sought only to secure to IES restrictions on the type of employment that Mr. Shoup could undertake at CES (and I note such restrictions were not followed in the Shoup-CES agreement), and to appropriate for IES any products developed by Mr. Shoup while at CES which were applicable to the Shoup product line or any improvements or modifications thereof. Secondly, there is grave doubt in my mind that IES would be permitted to restrict the activities of one of its major competitors in a rather covert manner via a provision in one contract (the IES–CES contract), which purports to make IES the intended beneficiary of another contract (the Shoup-CES contract). Finally, if I were required to rule on the reasonableness of the restrictive covenant in the Shoup-CES contract, and thus its enforceability, I would hold it unreasonably broad both in its geographical scope (the entire United States) and in the scope of activities from which Mr. Shoup is to be barred. Even a cursory examination of the covenant reveals that its effect would be to deprive Mr. Shoup of participating in any activity that since his youth had constituted his entire livelihood. The breadth of the covenant is unreasonable, there is no provision for severance of the covenant into reasonable components, and it is not this Court's function to redraft an agreement that was unskillfully drafted by parties, one of which is not even before this Court. It is clear that if CES would not have been permitted to enforce this restrictive covenant, IES would certainly have no such right.

75. In sum, I conclude that the 1955 contract between Ransom F. Shoup and the SVMC was in effect as of March 18, 1972; the SVMC unlawfully terminated that agreement, freeing Ransom F. Shoup to use the patents and improvements formerly assigned by him to the SVMC; plaintiff stands in the stead of SVMC and is bound by the 1955 agreement; the defendants did not enter their respective CES contracts with intent to defraud IES; IES was not an intended beneficiary of the Shoup-CES contract; the defendants did not breach their respective CES contracts or any assumed fiduciary duty to IES; and the defendants may freely compete with IES and CES.

## PATENT INFRINGEMENT

The rights granted Ransom F. Shoup under the 1955 agreement are for the most part determinative of the claims of patent infringement.

At issue are four United States Letters Patent Nos. 2,953,296; [3] 3,170,623; 3,312,390 and 3,436,011; each of these relates to improvements to voting machines. There is no dispute as to the validity of these patents, and the only questions to be resolved are whether the defendants infringed these patents in performing service work on machines sold by plaintiff, and whether the machine manufactured by defendants since 1973 infringes these patents.

Ransom F. Shoup was the inventor of the improvements protected by the patents, and the patents were issued to him. Under ¶ 7 of the 1955 agreement, he assigned these and other patents to the SVMC, plaintiff's predecessor. IES now owns these patents.

My former rulings on the contract issues have narrowed the issues I must decide here. Whether any of the defendants in-

---

**3.** This patent expired on September 20, 1977.

fringed the patents in servicing machines sold by plaintiff is a moot question for the period of time between February 11, 1972, and the date of Mr. Shoup's death, for each of the defendants had a right during that time to use the patents. I need not decide, therefore, whether their work constituted a "repair" or a "reconstruction" of the machines they serviced. In reaching this conclusion, I expressly reject plaintiff's argument that defendant Ransom F. Shoup forfeited his right to use the patents by his activities subsequent to March 18, 1972; this question had been left open by my July 3, 1975 ruling. In short, I find no impropriety in Mr. Shoup's solicitation of work during the hiatus between his respective employment with IES and CES, or in his various endeavors during and subsequent to his employment with CES.

I further reject the argument of plaintiff that defendant's April 26, 1972 agreement with CES constituted a novation of the 1955 agreement. In the first place, plaintiff failed to plead a novation. One who seeks to assert a novation must plead and properly prove it. *Yoder v. T. F. Scholes, Inc.,* 404 Pa. 242, 173 A.2d 120 (Supreme Ct. 1961). Above and beyond that fatal fact, one essential element of a novation is the consent of the parties, *Lamb v. Allegheny County Institution District,* 363 Pa. 66, 69 A.2d 117 (Supreme Ct. 1949), and the record is devoid of evidence that Ransom F. Shoup knew the terms of the IES–CES contract, much less that he consented to give up, without any additional consideration, his substantial right under the 1955 agreement to use his patents. I am quite convinced that had Ransom F. Shoup, in April 1972, had even an inkling of what IES now asserts to be the case, he would never have entered the CES agreement.

Because the right which Mr. Shoup, and thus each of the other defendants, had to use these patents expired with his death, it is necessary for me to decide whether (1) if the service work previously performed by the defendants were to be continued, it would violate any of these patents, and (2)

whether the machine manufactured by defendants violates these patents. Plaintiff claims that the defendants' service work violates Claims 2 and 4 of Patent No. 2,953,-296; Claim 1 of Patent No. 3,170,623; Claims 1, 4 and 5 of Patent No. 3,312,390; and Claims 1 and 2 of Patent No. 3,436,011. The identical claims are alleged to be infringed by the voting machine manufactured by defendants. With regard to these issues, I make the following Findings of Fact and Conclusions of Law.

### Service Work

### The 2,953,296 Patent

76. Patent No. 2,953,296, issued to Ransom F. Shoup on September 20, 1960, and to which IES gained ownership by mesne assignments, expired on September 20, 1977. At that time, the right to make, use or sell the improvements patented therein passed to the public and IES lost its right of enforcement. While there was a short period of time, approximately one month in length, subsequent to Mr. Shoup's death and prior to the expiration of this patent, in which the defendants may have performed infringing service work, I conclude that for all practical purposes infringement of the '296 patent is a moot question. It is therefore unnecessary for me to rule on that issue. *Phillips Petroleum Co. v. Sid Richardson Carbon & Gasoline Co.,* 293 F.Supp. 555 (N.D.Tex.1968), *aff'd,* 416 F.2d 10 (5th Cir. 1969).

### The 3,170,623 Patent

77. Patent No. 3,170,623 relates to the use of a wedge ("clip") to force the locking strip, located behind the moving handles, against the handles in order to prevent the handles from falling off. The record is devoid of any evidence that in performing their service work on machines sold by plaintiff, the defendants installed such a clip. There is no basis, therefore, upon which I can make a finding of infringement or non-infringement with regard to the defendants' service work. Whether the machine manufactured by defendants contains such a clip or an infringing equivalent is, of

course, a separate question, and will be ruled upon below.

### The 3,312,390 Patent

78. Patent No. 3,312,390 relates to means for connecting spindles in one column to the interlock of another column so as to utilize spindles in adjacent columns in combination with each other for one office. These spindles otherwise would remain as "dead space" because for any one column the number of unused spindles after setting up one or more offices in that column is insufficient to accommodate the number of candidates for any other office. For example, assume that one voting column has ten spindles. Assume further that there are six candidates for the office of mayor and that each voter is entitled to one vote for that office. Because conventionally all of the voting spindles in a vertical column are tied by their pull straps to a single corresponding interlock, it is necessary that all candidates running for a given office be listed in the same column. This means that in our example there are four unused spaces at the bottom of the column. If for our imaginary election, there is no office for which there are four or fewer candidates, those four unused spindles will serve no function. The purpose of this invention was to allow these leftover spindles to be connected to the interlock on an adjacent column where there are also a given number of unused spindles. In this manner, greater use is made of the limited number of spindles on a voting machine, a result deemed to be important in light of the growing number of candidates, offices, and questions that are voted on in modern day elections.

79. With a few exceptions which are not relevant here,[4] the evidence relating to the performance of allegedly infringing service work by the defendants was presented at the hearing on November 12, 1973, on defendants' Motion for a Preliminary Injunction. That testimony related to a contract given by the City of Philadelphia to Ransom F. Shoup, for the modification of voting machines.

80. The modification work done for the City of Philadelphia was described in detail at that hearing, and it is clear as it was at that time, that none of this work infringed the '390 patent. Indeed, the only testimony elicited by plaintiff's counsel that showed any connection between the work done and the patents in issue concerned the '296 patent.

81. I reaffirm my earlier finding that the service work performed for the City of Philadelphia did not infringe the '390 patent. In short, I have no basis upon which to decide the infringement issue with regard to the time period subsequent to Mr. Shoup's death, because there is no evidence of infringing service work prior to that time insofar as the '390 patent is concerned. To put it another way, as with the '623 patent, plaintiff has failed to sustain its burden of proof on the service work infringement issue.[5]

4. There is testimony in the record concerning the performance by Mr. Shoup of contracts that he had with St. Louis, Missouri, and Jackson County, Missouri, in which he installed vertical voting interlocks on the columns of voting machines. In the St. Louis job, he testified that he connected those interlocks to the shutters of the personal choice mechanism, N.T. 5–152; he testified that he did not connect those interlocks in the same way for the Jackson County job. N.T. 5–155. There is also testimony that prior to May 1972, Ransom F. Shoup performed some work for Cook County, Illinois, in which he helped to set up machines for an upcoming election. While he testified that he "repaired" the machines, counsel elicited from him only the fact that he checked the machines to see if the counters were going to

work. Finally, there is also testimony that custodians in Jackson County, Missouri, had the know-how to interconnect with the personal choice mechanisms vertical voting interlocks.

Without drawing any conclusions as to whether such evidence would support a claim of infringement, I note that the work done on the Missouri contracts relates to the 2,953,296 patent, not the '390 patent. I have already ruled that the '296 patent has expired. Due to the scope of the testimony concerning Cook County, it is inconsequential. I note also that the Missouri contracts were obtained by Mr. Shoup after he was terminated by IES and before he was employed by CES.

5. The only direct testimony concerning the interconnection by defendants of a spindle in one

*The 3,346,011 Patent*

82. Patent No. 3,346,011, relates to a shim or compensator which is used as part of the programming mechanism for the interlock in order to take up space between the movable rollers contained therein, thereby limiting the number of wedges which can be inserted into the interlock when the voting spindles are turned. The practical effect of this invention is to allow the capacity of the various interlock sections to be modified to allow fewer or greater numbers of votes to be cast, as desired, without pulling out the locking pins or dismantling any other part of the interlock.

The interlock is originally made big enough to accommodate the largest conceivable number of candidates and the space is then reduced by inserting these shims to decrease the available play in the interlock section. For example, assume that the interlock can accommodate a maximum number of twenty wedges. (Wedges are pulled into the interlock when a vote is cast; in other words, each wedge represents a possible vote.) Assume further that twelve candidates run for city council and that five may be elected. Shims would be inserted into the interlock so that a maximum of five wedges could be pulled into the interlock before the interlock would be immobilized, preventing further vote casting. If in a subsequent election voters were entitled to vote for only two of a certain number of candidates and the same interlock was used, additional shims would be inserted into the interlock in order to allow only two wedges to be pulled into the interlock before it became immobilized. The operation can work in reverse.

83. Defendants are alleged to have infringed Claim 2 of the '011 patent, covering the combination of the shim with the interlock, by selling interlocks or machines with interlocks to jurisdictions which had shims in their possession. That is, they infringed by causing others to infringe.

Ransom F. Shoup II testified that this compensator had never been sold or manufactured by defendants. There is no direct testimony to the contrary. There is no testimony that any customer of the defendants ever used this spring-type compensator, although the defendant Ransom F. Shoup testified that various jurisdictions, Louisiana in particular, had numerous compensators, both the earlier flat kind, and the spring-type in their possession. Ransom F. Shoup also testified that he did not sell the compensator covered by the '011 patent. Finally, Mr. Smiles testified that to his knowledge, no company other than IES or its predecessors sells the spring-type compensator.

84. The earlier, flat compensator may be used in conjunction with the interlocks sold by defendants. The parties stipulated that the flat compensator (Exhibit D–16) does not infringe the '011 patent.

85. I find that the defendants did not sell and, therefore, did not directly infringe this patent. I further find that, absent evidence that any customer used the spring-type compensator, the law precludes me from concluding that defendants are chargeable with contributory infringement. If there is no direct infringement of a patent there can be no contributory infringer. *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 526, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1971); *ARO Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 341–42, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). In addition, it is clear that the interlock is capable of substantial non-infringing use; that, too,

column to an interlock in an adjacent column, was given by Ransom F. Shoup II.

> Q. Have the defendants ever connected a spindle in one column to an interlock which is adjacent to another vertical column?
> A. Have they ever done it?
> Q. Have the defendants.
> A. Defendants being us?
> Q. That is correct.
> A. No, not in this manner. (N.T. 7–94.)

It may have been fruitful for plaintiff's counsel to pursue the qualification that the witness put on his final answer, but that was not done, and the fact remains that the defendant denied interconnecting these two parts of the machine.

would preclude a finding of contributory infringement.[6]

86. In sum, defendants may not sell the '011 shim, but they may continue their service work insofar as it requires them to supply interlocks which are capable of a substantial non-infringing use, by being used in conjunction with the flat compensator.

### Machine Manufactured by Defendants

### The 3,170,623 Patent

87. Claim 1 of the 3,170,623 patent reads as follows:

A voting machine including a front wall,

voting spindles projecting through said wall,

enlarged heads carried by said spindles,

operating handles for said spindles,

each handle including a round hub having a transversely disposed slot for engaging the head of a corresponding spindle to prevent axial movement of said handle relative to said spindle,

a flexible locking strip having round holes engageable with said hubs to prevent lateral movement of the handles relative to their corresponding spindles, and a clip having a high portion and a low portion, and

means rotably mounting said clip adjacent said handle and said strip whereby rotation of said clip to bring said high portion between said front wall and said strip prevents lateral movement of said handles relative to said spindles and whereby rotation of said clip to bring said low portion between said strip and said front wall permits disengagement of said strip from said hubs and permits lateral movement of said handles relative to said spindles.

88. Defendants' machine does not contain the clip described in Claim 1 of the '623 patent. Rather, it contains a continuous strip of plastic material, called Vinylite, with holes at repeating intervals to engage the spindles. The strip is placed under the handle plate on each side of the spindle. It serves to hold on all the handles of each column, and in the words of Ransom F. Shoup, "[t]he trick is [that] the thickness of the Vinylite holds the handle up." Deposition of Ransom F. Shoup, October 3, 1974, p. 67. The Vinylite strip prevents lateral movement of the handles relative to the spindles so that the handles cannot be removed from the machine without removing the Vinylite strip from behind the handle plate.

89. As the defendants' machine does not contain the clip specified in Claim 1, it obviously does not contain means rotably mounting such clip to the front wall of the voting machine adjacent the handle.

90. Although Claim 1 of the '623 patent does not read on the Vinylite strip, the strip may nevertheless infringe that patent under the doctrine of equivalents, if it performs substantially the same function in substantially the same way in order to achieve substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Where an applicant has amended his claim in the Patent Office to meet an objection based on prior art, the applicant is estopped from arguing the doctrine of equivalents in attempting to prove infringement of his patent by another who is using the means that were abandoned by the applicant. That is, one cannot recapture in an infringement action the breadth of a patent previously abandoned in the Patent Office. This is known as the doctrine of file wrapper estoppel. *Trio Process, supra.* File wrapper estoppel does not apply where the aspect of the claim dropped in the give-and-take before the Patent Office is different from that aspect of the

---

**6.** If, in fact, the customers who possessed the '011 shim purchased those shims from plaintiff, those customers had a right to use those shims, and defendants would not have infringed the patent by inserting those shims into the interlocks. The record lacks any evidence as to the means by which these customers came into possession of the shims.

claim alleged to be infringed by defendants. *Burger Train Systems, Inc. v. Ballard,* 555 F.2d 1377, 1383–84 (10th Cir. 1977), *cert. denied* 434 U.S. 860, 98 S.Ct. 185, 54 L.Ed.2d 132.

91. Defendants' Vinylite strip does not infringe Claim 1 of the '623 patent under the doctrine of equivalents. While it has substantially the same function as the clip, in that it is pressed up against the handle plate to prevent the lateral movement of the handles, and while it achieves substantially the same result, in that it prevents the unauthorized removal of the voting handles, it does so in a manner completely different than plaintiff's clip.

The plaintiff's flexible locking strip works only in conjunction with a clip having a high and low portion, with means that rotably mount said clip to the front wall adjacent to the voting handle. In plaintiff's machine the means rotably mounting the clip is a rivet. Claims must be construed in light of the limitations contained therein. The language of the claim is clear not only that the claim reads on a clip, but that the clip is rotably mounted to the front of the voting machine. In contrast, defendants' Vinylite strip has no such clip, has no means rotably mounting said clip, and depends solely on its thickness to achieve the desired result.

92. Even if I were to conclude that defendants' Vinylite strip operated in the same manner as plaintiff's clip, I find that there is no infringement because plaintiff is estopped to assert the doctrine of equivalents. The file wrapper of Patent '623 reveals that the patent application originally contained eight claims which broadly described a voting machine having removable handles (Exhibit D–128). I note that the title of the patent is still cited, and incorrectly so, as a voting machine with removal voting spindle handles. In rejecting Claims 1 through 7 and 9,[7] the Examiner found that neither the locking strip nor the "protective means" for maintaining the

locking bar in operative position defined over prior art. He stated:

Note that locking bar 32 [of the Gustafson 2,189,951 patent] is effective to prevent unauthorized removal of the voting keys. The structure shown by Gustafson is deemed the structural and functional equivalent of [the applicant's] claim.

The fact that the locking strip has "round holes" as set forth in Claim 5 does not distinguish over Gustafson who also shows a circular shape for the locking bar.

Regarding Claim 6, note that the reference [meaning the Gustafson patent] provides adequate means to maintain the locking bar in operative position.

Regarding Claim 7, it is quite obvious that Gustafson's arrangement has the "protective means" called for herein.

In response to the Examiner's findings, the applicant cancelled all of the rejected claims and amended Claim 5 to include the reference to a clip having a high and low portion and means rotably mounting said clip. Claim 5 now appears as Claim 1 of the '623 patent. Two newly submitted claims, one relating to the selective removability of a voting handle and the other relating to means for amounting a handle, were later rejected as unpatentable over Andrie Patent 2,158,789. Claim 5 as amended was allowed. *See* Papers Nos. 6 and 8 in Exhibit D–128.

The distinguishing feature in the '623 patent which entitled it to be patentable over the Gustafson patent was the rotably mounted clip. For this reason, the restrictive language in Claim 1 cannot be ignored. That restrictive language does not read on the defendants' Vinylite strip, and plaintiff is estopped from asserting that the thickness of the Vinylite is equivalent to the rotably mounted clip. Hence, there is no infringement. *Schmidinger v. Welsh,* 383 F.2d 455 (3d Cir. 1967).

7. A ninth claim had been added by the applicant in an earlier amendment of the application. See p. 15 of Exhibit D–128.

### The 3,312,390 Patent

93. The claim that defendants' machine infringes Patent No. 3,312,390 (relating to the connection of voting spindles in one column to an interlock in an adjacent column) depends solely on whether I accept the testimony of Mr. Smiles that defendants' machine has all the elements covered by Claims 1, 4 and 5, except the means of connecting the spindles in one vertical column to the interlock of another vertical column; he testified that the means were not present in the defendants' machine.

Relying upon his examination of the defendants' machine, Mr. Smiles concluded that in view of the limited number of personal choice slots on defendants' machine, the voting spindles in one column must be connected to the interlock of another column in order to set up the machine to run an election. It is important to set forth in Mr. Smiles' own words his reason for reaching this conclusion.

> Because you couldn't program your write-ins so that they all occurred on the one row on the same series of spindles or else the write-in capacity of your machine will be limited to an extent that you just wouldn't be able to use it. N.T. 4–95 to 4–96.

The legal conclusion drawn is that defendants have caused every customer to whom they have sold voting machines to infringe this patent. Defendant Ransom F. Shoup II testified that the defendants have never connected the spindles in one column to the interlock on another column in the manner described in the patent cases.[8] *See* n.6 *supra*.

■ 94. Mr. Smiles was not qualified at the trial as an expert in voting machines; if he had been, I nevertheless would be entitled to reject his testimony if I found it unconvincing or so unclear and vague that I would have to speculate as to its intended meaning.

■ I have studied Mr. Smiles' testimony, the patent specifications and claims, and photograph No. 136, and I have endeavored at length to decipher the reasons given by Mr. Smiles in support of his conclusion. It is a close and difficult question, but I am convinced that plaintiff failed to support its claim of infringement of the '390 patent. Plaintiff asks me to conclude solely on the basis of Mr. Smiles' testimony, not only that the machine must have means by which to make the said connection, but plaintiff also asks me to conclude that the means would be the same ones specified in the patent claims and would infringe those claims. Patent infringement is a serious charge, and the plaintiff carries the burden of proving that the patent claim reads on the allegedly infringing device. It is evident that plaintiff has failed to meet that burden, and I can make no ruling with regard to the defendants' right to continue to manufacture the machine that was alleged to infringe the '390 patent.

### The 3,346,011 Patent

95. Defendants are alleged to infringe Patent No. 3,346,011, by the use in their machine of the shim or compensator covered by the patent. Mr. Smiles examined the defendants' machine on display in three Florida cities, and he testified that on each of those three occasions, the spring-type compensator covered by the '011 patent was used in the defendants' machine. N.T. 4–105. Defendants do not deny that they have used the shim, but they argue that each and every shim so used was acquired from persons who previously had purchased them from plaintiff or its predecessor. More particularly, Ransom F. Shoup II tes-

---

8. Photograph No. 136, attached to plaintiff's Request for Admissions, shows the machine that was examined by Mr. Smiles at Essington; the machine at that time was not set up for an election. A close examination of the photograph reveals that on the second row of spindles from the left there is a bar with a series of holes in it going from the top of the machine to the bottom; a butterfly cam in the center of that bar is attached to one of the holes in the bar by means of a stud. The bar on that machine "went down to the [personal choice] mechanism at the bottom." N.T. 4–95. It was not connected to the personal choice mechanism.

tified that the only time the defendants used the spring-type shim, the shim was one they had found in machines that they took in on trade. N.T. 7–96 to 7–97.

96. The resolution of this infringement issue hinges on the credibility of these two witnesses, for under the law if the defendants' version of the facts is true, they cannot be held to have infringed the patent by their use of the shim. *United States v. Univis Lens Co.*, 316 U.S. 241, 249–50, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942); *Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*, 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500 (1894); *J. F. Rowley Co. v. Rowley*, 18 F.2d 704 (3d Cir. 1927).

97. Recall that Mr. Smiles testified that to his knowledge, IES and its predecessors were the only companies who manufacture or sell the spring-type shims. Recall further that defendants flatly deny ever having manufactured or sold this shim; that testimony was not controverted. With this in mind, I must conclude either that the defendants acquired these shims from persons who had lawfully obtained them from plaintiff or its predecessors, or that defendants unlawfully converted these shims from plaintiff's possession to their own use. In light of evidence contained elsewhere in the record that defendants converted various items owned by plaintiff to their own use, plaintiff urges me to conclude that they converted in this instance as well.

 I am not free to presume that defendants have converted these shims. Plaintiff has the burden of proving such conversion, and cannot rely on other instances of conversion to support this particular claim of conversion solely because the items alleged to have been converted in each instance relate to voting machines.

The record is clear both that defendants did take machines in on trade and that at the time defendants left IES and CES employ, the machines made and sold by those companies contained the spring-type compensator. N.T. 7–98. In light of this, and in light of the plaintiff's failure to come forward with any evidence in support of its claim, I conclude that the use in the machine manufactured by defendants of the '011 shim did not infringe the '011 patent.

## UNFAIR COMPETITION

Plaintiff claims that defendants appropriated and used to the plaintiff's detriment trade secrets owned by plaintiff, namely, an aerospace method of inspecting; the method for connecting counters and interlocks; quality-control criteria;[9] the "18-year-old mechanism;" the 10-column machine; the "machine book;" and unnamed technical drawings, specifications and blueprints. Plaintiff also claims that defendants engaged in unfair competition by copying the trade dress of plaintiff's machine; falsely representing themselves to be successors to the SVMC; hiring plaintiff employees, and using and infringing plaintiff's "moving X" trademark and the trademark and trade name "Shoup," all with the intent to confuse customers as to the identity of defendants so as to gain plaintiff's customers.

### Trade Secrets

 A trade secret has been defined in rather general terms to be any formula, pattern, device or compilation of information which is used in one's business, and which gives that business an opportunity to obtain an advantage over competitors who do not know or use it. *Restatement of Torts* § 757, comment b. An employer who seeks equitable relief against its former employee must prove that (1) there was a trade secret or a secret process of manufacture; (2) it was of value to the employer and important in the conduct of his business; (3) by reason of discovery or ownership, the employer had the right to use and enjoy the secret; and (4) the secret was communicated to the employee while he was employed in a position of trust and

---

**9.** I will not deal with this claim because there is no evidence whatsoever relating to defendants having appropriated the criteria.

confidence under such circumstances as to make it inequitable for him to disclose it to others to the prejudice of his former employer. *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 259, 213 A.2d 769 (Supreme Ct. 1965), *citing, Macbeth Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 A. 688 (Supreme Ct. 1913). Information which is common knowledge, a matter of public record, or easily ascertainable does not qualify as a trade secret. *Midland-Ross Corp. v. Yokana*, 185 F.Supp. 594, 599 (D.N. J.1960), *aff'd*, 293 F.2d 411 (3d Cir. 1961). Where the item or information claimed to be a trade secret is sold to the public, it loses its status as a trade secret. *Midland-Ross Corp. v. Sunbeam Equip. Corp.*, 316 F.Supp. 171 (W.D.Pa.), *aff'd*, 435 F.2d 159 (3d Cir. 1970); *Midland-Ross Corp. v. Yokana*, 293 F.2d at 413; *Van Prods. Co. v. General Welding & Fabricating Co.*, 419 Pa. at 268, 213 A.2d 769. Where the nature of the alleged trade secret is ascertainable upon inspection, it does not qualify as a trade secret, even if the machine must be rendered inoperative and an expert engineer engaged in order to ascertain how the product is made or how it operates. 293 F.2d at 413. Customer lists and technical drawings may be considered trade secrets as long as they are retained in secrecy. An employee may take with him upon terminating his employment relationship with his employer, the experience, knowledge, memory, and skill which he gained while employed.

 Some factors to be considered in determining whether given information is a trade secret are: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Restatement of Torts* § 757, comment b.

98. Defendants Ransom F. Shoup and Ransom F. Shoup II are experts with regard to the manufacture and sale of voting machines, their vast knowledge being based on research and development, and years of experience in sales and service work.

### a. *Aerospace Method*

99. Plaintiff failed to meet its burden of proving that the aerospace method of inspecting interlocks is a trade secret. Plaintiff did not prove that the method was used only by plaintiff, that it was secret, or that it was, in fact, communicated to defendants. While Ransom F. Shoup was known to have observed the production line at United Aero Products, there is no testimony that the method was in use in the production line observed by him. Most importantly, there was no proof that defendants use this method.

### b. *Method of Connecting Counters and Interlocks*

100. Plaintiff failed to meet its burden of proving that the method for connecting counters and interlocks is a trade secret. Defendant testified that he had been connecting counters and interlocks since 1932. Mr. Meyers, former president of the SVMC, testified that Mr. Shoup invented the counters and the interlocks and that he certainly knew how to put them together. Mr. Meyers specifically refuted the surmise of Mr. Smiles that Mr. Shoup learned this method of interconnection while observing the manufacturing operations as they began, approximately in 1972, at United Aero Products. Deposition of Irving H. Meyers, August 22, 1974, pp. 69–71.

### c. *18-Year-Old Mechanism*

101. The purpose of the "18-year-old mechanism" was to allow voters between the ages of 18 and 21 to vote for federal offices, but to preclude them from voting for any state, county or local office. That mechanism was given little if any use in light of the changes in state law allowing

18-year-olds to vote, although Mr. Smiles testified that the concept embodied in the mechanism has been used by the plaintiff as a column-control mechanism. Mr. Shoup was instrumental in developing the 18-year-old mechanism.

■ 102. Plaintiff failed to prove that defendants used the 18-year-old mechanism in their machines. While Mr. Smiles testified that the 18-year-old column control mechanism was incorporated into the defendants' machine as either a primary selector or a split-column control mechanism, N.T. 5–91, his testimony was conclusory only and he failed to set forth any basis upon which this Court could decide whether or not to agree with him. Mr. Smiles also testified that the defendants' machine contained two devices that were "similar" to the 18-year-old mechanism, N.T. 5–13; the use of a mechanism similar to one alleged to be a trade secret is not actionable as unfair competition unless the Court is provided with sufficient detail to convince it that the mechanism used by defendants unfairly embodies the gist of the trade secret. Furthermore, I am convinced that if Ransom F. Shoup used the 18-year-old mechanism in his machine, he was entitled to do so under ¶ 9 of the 1955 agreement.

### d. *10-Column Machine*

103. The testimony concerning the 10-column machine is both sparse and scattered in the record, and my task is made even more difficult by counsel's failure to address this in post-trial briefs. IES does not manufacture a 10-column machine, although it is clear that it paid Essington Metal Works for research in connection with either the development of a 10-column machine or the conversion to a 10-column machine of an 8-column machine. Mr. Shoup played a large role in this research and development work.

While I am not convinced that the method for adding to an 8-column machine an additional two columns could qualify as a trade secret, both because of the lack of evidence relating thereto and the plaintiff's disclosure of this work to Essington Metal

Works without restricting the use of that information, I find that the development of a 10-column machine by Ransom F. Shoup is as easily attributable to his expertise and experience in developing improvements for voting machines as it is to information revealed to him while he worked for plaintiff. In short, plaintiff has failed to meet its burden of proof. Alternatively, were I to find that the method of manufacturing a 10-column machine was indeed a trade secret, and was imparted to Ransom F. Shoup while he was in a position of confidence in plaintiff's employ, I conclude that ¶ 9 of the 1955 agreement entitled him to use his knowledge so gained.

### e. *Customer Lists, Machine Book and Technical Documents*

■ 104. When Macrodyne purchased the SVMC, it acquired the SVMC customer files and "machine book." The machine book describes every machine that has been produced and its serial number; where it is located; the number of machines in the various counties; and information as to when each county will be in the market for more machines. One other piece of critical information contained therein is the identity of the purchasing authority in each jurisdiction; this information is not ascertainable from examining public records, and can only be obtained by a hit-or-miss type of effort that is both time consuming and costly. Plaintiff considered this machine book to be unique and proprietary. Together, the customer lists and machine book constituted an invaluable market survey. I find that the customer lists and the machine book were trade secrets owned by plaintiff and of significant value to plaintiff. I further find that plaintiff had a right to use such information.

105. Macrodyne also obtained from the SVMC its technical drawings and blueprints. These documents were subsequently passed to IES. While there is some doubt in my mind as to the degree of secrecy with which these documents were kept by the plaintiff and its subsidiary, United Aero Products, in light of their unrestricted

transfer to Essington Metal Works, Republic Steel, and perhaps Gries Reproducer Company, and the relatively free access that all employees had to such records, I am nevertheless convinced that these documents qualify as trade secrets.

106. I find that Ransom F. Shoup II had free access to all the engineering, sales and service files of the plaintiff, and that Ransom F. Shoup had access to the manufacturing files.

107. I find that when Ransom F. Shoup II left IES to join CES in April 1972, IES personnel and possibly CES personnel copied proprietary information from the files of IES under the direction of Ransom F. Shoup II. I further find that this copying was done with the full knowledge and permission of IES management. CES was furnished this material so that it could better fulfill its role as the exclusive sales agent for IES.

CES was given copies of the plaintiff's customer lists; portions of the machine book; parts manuals; price lists; brochures; and copies of typical sales agents' contracts.

108. There is conflicting testimony as to whether Ransom F. Shoup II returned or relinquished control of these files to IES or CES when he left CES in September 1972. Mr. Smiles testified that after Mr. Shoup had left CES, and after IES had modified the CES agreement so as to terminate CES as the sales agent for IES, he requested of CES any information that had been given to them to help them in their selling activities; he specifically requested the information taken by Mr. Shoup to the CES office of Fort Washington, Pennsylvania. N.T. 5–21. We do not know what response if any CES gave to Mr. Smiles' inquiry; Mr. Smiles did subsequently testify, however, that after Mr. Shoup II left the SVMC for CES, he never returned the documents that were taken. Mr. Smiles did not state what basis he had for so testifying; that is, he did not state whether he had inquired of those at the IES office whether Mr. Shoup had in fact returned the materials.

Mr. Shoup II testified, on the other hand, that when he left CES he returned the files to a Mr. Gerbel, who was either a liaison between IES and CES or a CES employee. Plaintiff did not call Mr. Gerbel as a witness to rebut Ransom F. Shoup II's testimony. It is rather obvious that the type of information turned over to CES by Ransom F. Shoup II was invaluable to CES whether or not CES was acting as the exclusive sales agent for IES, for CES was engaged in promoting punch-card voting systems in competition with IES, and later with the defendants. I am inclined to believe Ransom F. Shoup II and to find that he did return or dispose of the documents he had taken with him to CES; but even if I were to find that he had not relinquished control of the documents to Mr. Gerbel, I nevertheless find that the defendants have not used this information to the detriment of plaintiff.

109. Ransom F. Shoup II admitted that he had published two parts lists, one entitled "Ransom F. Shoup & Co., Inc., 3.2 Shoup Voting Machine Parts Price List," and the other entitled "Ransom F. Shoup & Co., Inc., 2.5 Shoup Voting Machine Parts Price List." Exhibits P–12 and P–13. The parts numbers on these lists were those used by the SVMC and IES to identify their products. N.T. 6–133.

He also admitted that he copied the parts numbers from a CES parts list (Exhibit D–160). CES had been supplied with IES parts price lists in connection with its IES–CES contract. N.T. 6–124. The IES and CES parts price lists were freely distributed to customers by IES and CES.

There is no evidence that any of the defendants ever sold any part listed on the defendants' price list or those of IES or CES. The defendants' price list was distributed to three customers.

110. On the basis of the following factors, I find that plaintiff did not meet its burden of proving that defendants had appropriated any technical drawings or blueprints owned by IES or United Aero Products.

Plaintiff's evidence consisted of speculation and surmise by the president of IES that the Shoups had in fact pilfered these documents, drawings and blueprints. Mr. Smiles testified that he could not "say in detail exactly what was copied," nor could he testify as to what the nature of all the records were. N.T. 5–46. This alone is not critical, for in unfair competition cases it is often very difficult to produce direct testimony that files or documents were in fact taken. Mr. Smiles also testified that if Ransom F. Shoup II had not taken sales records, he would be "very surprised." N.T. 5–46. He stated that he could "only speculate" as to what had become of certain blueprints that had been produced by United Aero Products at the request of the Shoups. N.T. 5–95. Mr. Smiles' belief, and it was admittedly simply a belief, that the Shoups had appropriated the customer lists and technical data was based on two factors. One was that Ransom F. Shoup II could not have published the parts list in September 1972 if he did not have the technical specifications that were alleged to have been taken, and the other was the obtaining by Ransom F. Shoup of the Jackson County, Missouri, and St. Louis, Missouri, contracts.

The reasons advanced by Mr. Smiles in support of his belief are not compelling. As Mr. Smiles himself recognized, there is a vast difference between belief and evidence. N.T. 5–71. It was not necessary for the defendants to have the plaintiff's technical records in order to produce the price lists; all that was required was that the CES price list be copied. Furthermore, regardless of what Mr. Smiles believed, Ransom F. Shoup II specifically denied that he told his father about either the St. Louis or Jackson County contracts. When Ransom F. Shoup II expressed concern to high-level management personnel at IES over the possible conflict of interest arising from his relationship with his father (while Shoup II was still president of the SVMC), he was

assured by Mr. Benning that he was trusted in this regard. Finally, both the St. Louis and Jackson County contracts were obtained by Ransom F. Shoup long before his son copied the customer list in preparation for employment with CES.

111. There is absolutely no evidence in the record that the defendants used the plaintiff's technical drawings or blueprints.[10] While there is some testimony in the depositions of Messrs. Thompson, Schuchardt, and Morley, that IES technical drawings may have been supplied to them for their use in developing parts for customers other than IES, there is no testimony that defendants were responsible for supplying such drawings; that these IES drawings were in fact used; or that any of these companies made parts for the defendants. Mr. Morley, on behalf of John Hassall Corporation, testified that the records of his company revealed no transaction with Essington Metal Works, and while Mr. Thompson on behalf of Alcoa, and Mr. Schuchardt on behalf of Griers Reproducer Company, testified that their company made parts for Essington, there was no evidence that the parts were ordered by Essington on behalf of the defendants.

112. I am convinced that the defendants did not have the plaintiff's customer lists in light of the substantial evidence in the record concerning the defendants' efforts to identify and develop a market for their machines, including their use of a clipping service, N.T. 7–67 to 7–68, and their retention of the R. L. Polk Company in Detroit, Michigan, to supply them with names of county government seats in selected states. N.T. 6–150. Mr. Smiles conceded that through their sales and service work over the years, the Shoups had made many important contacts with election officials, N.T. 5–44; these contacts no doubt served them well in building their own market. In short, if defendants had possession of the plaintiff's customer lists and the machine

---

**10.** I dealt earlier with the contention of Mr. Smiles that the prototype machine built by defendants in late 1972 could not have been built in such a short period of time without the use of technical drawings owned by IES or its predecessors. *See* Findings of Fact Nos. 60–65.

**710**

book, they would not have had to scurry around as they did to establish what was the most basic data base for developing a market; I recognize that they nevertheless would have to work hard to develop and follow up on new leads.

### Confusion

Plaintiff and defendants are two of three companies that manufacture the lever-type voting machine. Their machines are vertical, whereas the third company, Automatic Voting Machine Corporation, produces a horizontal machine. The purchase of voting machines, accessories and service work therefor generally involves the expenditure of large sums of money. The purchasers, who are for the most part public authorities, usually make such purchases through competitive bidding; the successful bidder usually executes a written contract and posts a performance bond. Both the contract and the bond set forth the names of the parties entering into the contract. Plaintiff and defendants have bid against each other on numerous occasions.

The legal question to be resolved is whether there was a probability or likelihood of confusion in the customers' mind as to the source or origin of the product sold by the defendants. *Surgical Supply Serv., Inc. v. Adler,* 321 F.2d 536 (3d Cir. 1963); *Morgan's Home Equip. Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957). The plaintiff must prove that the desire is for a product made by the plaintiff; the public desire must be for the manufacturer, not the product, and if there is confusion, it must be confusion as to the origin of the product, not as to the goods. *General Radio Co. v. Superior Elec. Co.,* 321 F.2d 857 (3d Cir. 1963). The sophistication of the class of buyers is a matter of importance in deciding the question of probable confusion. *Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457, 462 (3d Cir.), *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968).

### A. Trade Dress

Identity in the appearance of a product is not itself actionable. The determination of liability for copying trade dress turns on a distinction between functional and non-functional features. Non-functional features may be copied unless they have acquired a secondary meaning in the minds of the purchasers, whereas functional features may be duplicated without restriction. The plaintiff has the burden of proving that a non-functional feature has acquired a secondary meaning. While subject to the above limitation the goods may be identical, they cannot be palmed off as the goods of another. To this end, a product with trade dress similar to the goods of another must contain a disclaimer or identifying information that will distinguish it from those other goods. *General Radio Co., supra; Smith, Kline & French Laboratories v. Waldman,* 69 F.Supp. 646 (E.D.Pa.1946).

113. On the basis of my observation of the plaintiff's and defendants' machines, and on the basis of the testimony in the record, I find that there is no merit to the plaintiff's trade dress claim. As the record sets forth in detail, the machines differ as to color, height, weight, and placement of various operating levers and counters. The labels of each machine differ in coloring and style. N.T. 5–26; 5–75; 5–121–5–125; 6–92; 8–2; Exhibit D–101. With one exception, I need not discuss the functional/non-functional distinction, for the machines are so different in appearance. The defendants' use for their counters of black numbers on a white background is identical to the plaintiff's use thereof, but clearly the counter performs a function, that of recording the number of votes cast. The identity, therefore, is not actionable.[11]

### B. False Representations of Being Successors to SVMC

114. I find that defendants at various times identified themselves as being

---

11. I give little weight to Mr. Smiles' insistence that the defendants' 35-row machine bears more similarity to the plaintiff's machine than does the defendants' 25-row machine, which was demonstrated during the trial. While the

addition of 10 rows would somewhat change the size of the machine, the differences in all of the remaining features would remain; those differences defeat the trade dress claim.

the successors to the SVMC; this representation was false and constitutes unfair competition. *See, e. g.,* N.T. 5–145 to 5–148 and Exhibit D–104.[12] The entitling by the defendants of their parts price list as a list of Shoup Voting Machine parts is an example of the defendants' improper behavior. Exhibits P–12 and P–13.

C. *Hiring of Plaintiff's Employees*

Inducing an employee to terminate a contract terminable at will is not in and of itself unlawful, where the inducer's purpose is simply to secure a skillful or knowledgeable employee. *Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 207 A.2d 768 (Supreme Ct. 1965); *Carl A. Coleryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276, 203 A.2d 469 (Supreme Ct. 1964). In order for the conduct to be improper, there must be an intent to cripple the plaintiff's business, or an intent to have the employee commit wrongs, such as disclosing his former employer's trade secrets or enticing away his customers. While the effect of the defendant's activities may be to cripple plaintiff's business, it is the intent that is critical. *United Aircraft Corp. v. Boreen,* 413 F.2d 694 (3d Cir. 1969).

115. There is no evidence in the record that any of the employees allegedly wrongfully hired by defendants had contracts other than ones terminable at will. With regard to sales representatives, I find that at the time they were hired by defendants, they were not employed by plaintiff. Exhibit D–21; N.T. 5–63–5–66, and 5–96. With regard to Jean Erickson, I find that she was not employed by IES at the time defendants hired her. There is no evidence that Roberta Levin was employed by the plaintiff at the time the defendants hired her. With regard to David Deufel and Zig-

mund Buczynski, I find that defendants solicited them to work for the defendant corporation with the intent to gain their knowledge and skills; I·find that there was no intent on the defendants' part to cripple the plaintiff's business or to elicit from Messrs. Deufel or Buczynski trade secrets of the plaintiff. I find that Harold Webb was never offered a job by the defendants.

In short, plaintiffs have failed to prove that any of the persons solicited by defendants was either an employee of plaintiff corporation at the time solicited, or that the defendants solicited that person with the requisite wrongful intent.

D. *Appropriation of the "Moving X" Trademark* [13]

The ultimate issue in a trademark infringement case is the likelihood that prospective purchasers will be misled by the defendants' use of the mark. *Brooks Bros. v. Brooks Clothing of California,* 60 F.Supp. 442 (S.D.Cal.1945), *aff'd,* 158 F.2d 798 (9th Cir. 1947), *cert. denied,* 331 U.S. 824, 67 S.Ct. 1315, 91 L.Ed. 1840 (1947). The mere possibility that a customer may be misled is not enough, and to establish a cause of action for unfair competition there must be proof of a likelihood that customers may be confused as to the source of the product by the defendant's use of the mark. *Surgical Supply Serv., Inc. v. Adler, supra* at 539. In addition, the particular class of customers to which the product is sold must be credited with at least a minimum capacity for discrimination. *Id.* A symbol that is merely descriptive or informative of the function of a good is not a trademark. *Q–Tips, Inc. v. Johnson & Johnson,* 206 F.2d 144 (3d Cir. 1953).

116. I find that the plaintiff failed to prove that the "moving X" mark had

---

**12.** Even during the trial, when the defendants were very conscious of the importance of correctly stating the names of their companies and of emphasizing the differences between those companies, the defendant Ransom F. Shoup stated that the Shoup Voting Machine Company was "now the Ransom F. Shoup Company," N.T. 6–7, and Ransom F. Shoup II gave answers concerning the defendant companies

when asked a question about the Shoup Voting Machine Corporation. N.T. 7–100.

**13.** Plaintiff did not plead its Complaint that defendants infringed the "moving X" trademark. The issue was tried by the implied consent of the parties, however, and shall be treated here as if it had been raised by the pleadings. Rule 15(b) of the F.R.Civ.P.

acquired a secondary meaning in the minds of prospective purchasers. I also find that there is no evidence in the record to prove that customers were likely to be deceived as to the source of the product by the defendants' use of the mark. Thus, while the "moving X" mark was used on at least one of the brochures of the SVMC, Exhibit P–121, unaccompanied by any description of the function of that X, I find that plaintiff failed to prove that it served as an identification of the source of the product advertised in those brochures. In all the other exhibits produced by plaintiff at trial, I find that the X was purely for informational purposes. As Mr. Smiles admitted, there is "no question" that the X appearing on the 3.2 and 2.5 machines served solely "to inform the voter as to what he must do in order to record his vote." 5–82 to 5–84. Similarly, while the X was found on pencil boxes and blazer patches distributed by the SVMC, plaintiff failed to prove that the mark had acquired a secondary meaning in the mind of the prospective customers or that the customers would be deceived by the defendants' use of this mark. One additional factor in my finding is that the plaintiff failed to prove continuous or exclusive use of the said mark. There is testimony in the record that the Automatic Voting Machine Corporation, a competitor of plaintiff, uses an X under each handle on its machine which is disclosed by the movement of a handle in a vote-casting direction. Similarly, Ransom F. Shoup testified that in his experience the type of mark a voter ordinarily uses to indicate preference for a candidate is an X. N.T. 6–89 to 6–90. *Cf. Redken Laboratories, Inc. v. Clairol Inc.,* 350 F.Supp. 1301 (C.D.Cal.1972), *modified,* 501 F.2d 1403 (9th Cir. 1974). The defendants' various uses of the symbol X accompanied by a symbol representing a voting handle does not infringe the mark used by plaintiff.

### E. *Infringement of the Trademark "Shoup"*

A cause of action arises under § 43 of the Lanham Act, 15 U.S.C. § 1125(a), when the defendant's use of a mark or name in connection with certain goods is likely to cause confusion as to the source of origin of such goods. *Societe Comptoir De L'Industrie Cotonniere Establissements Boussac v. Alexander's Dept. Stores, Inc.,* 299 F.2d 33 (2d Cir. 1962). The owner of a trademark need not federally register that trademark in order to invoke the statute. In order to collect damages for a violation of the statute, the plaintiff must show that actual confusion as to the source of origin of the product has occurred; an injunction will issue, however, upon a showing of the likelihood of confusion. *Hesmer Foods, Inc. v. Campbell Soup Co.,* 346 F.2d 356 (7th Cir.), *cert. denied,* 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 87 (1965). Plaintiff need not show an intent to deceive. The guiding principle in trademark surname cases is that once an individual's name has acquired a secondary meaning in the market place, a later competitor who seeks to use the same or similar name must take "reasonable precautions to prevent the mistake." *L. E. Waterman Co. v. Modern Pen Co.,* 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914).

117. The parties stipulated that IES and its predecessors have for many years utilized the name and trademark "Shoup" for the voting machines manufactured by them; they also stipulated that the voting machines have been known as "Shoup" machines.

118. While instances of actual confusion by prospective customers as to the producer of a certain machine were few in number; while Mr. Smiles testified that with regard to the Louisiana bid, it was IES rather than the customer who was confused; and while Mr. Smiles further testified that the confusion in Chambers County, Alabama, was not as to the company but rather as to the machine I find that the record supports a finding that plaintiff sustained its burden of proving a probability of confusion in the minds of prospective customers by the defendants' use, without adequate disclaimer, of the name "Shoup."

119. I find that plaintiff has not abandoned the name or trademark "Shoup."

120. I find that because the name Shoup is in fact the defendants' surname, and because the defendants have used the name "Ransom F. Shoup & Co." since 1955, and further because the defendants have a genuine interest in establishing an enterprise in which their own skill and knowledge can be made known to the public, it would be unduly harsh to proscribe all use of the surname Shoup. *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978).

121. I find that plaintiff's use of the name and trademark "Shoup" will be adequately protected by requiring the defendants to use a specific and prominent disclaimer on all their stationary, advertising materials and products, which states that neither the defendants nor their companies are related to the SVMC, and that the goods are not those of the SVMC. The defendants will be restrained from representing in any manner that they are the successors to the SVMC.

### Conversion

While Ransom F. Shoup and Ransom F. Shoup II were employed by the SVMC, they owed a fiduciary duty to that corporation. If while employed they used or sold their employer's property for their own use without authorization, they converted that property and must account for the damages caused thereby. Plaintiff asserts that it has proven four instances of conversion.

#### a. *Bost-Shoup II Transaction*

122. I find that those voting machine parts that were unused by Mr. Bost and unreturned by Mr. Deufel to the SVMC, were unlawfully converted by the defendants. Defendants will be required to reimburse the plaintiff in the amount of $3,857.38. I further find that the kickback arrangement that Ransom F. Shoup II had with Mr. Bost was a breach of the fiduciary duty owed by Ransom F. Shoup II to his corporation, and he will be required to account for so much of that profit received by him that was not repaid to Mr. Bost. I find that Ransom F. Shoup II received $1,056.54 from Mr. Bost and that he returned $850 of that amount to Mr. Bost. He will therefore be required to pay to the plaintiff $206.54.

#### b. *St. Louis Personal Choice Springs*

123. Plaintiff claims that 1,205 personal choice slide-bar springs were shipped to St. Louis on a no-cost basis under the authorization of Ransom F. Shoup II, and that that shipment was to enable his father to complete his contract with St. Louis. I find that plaintiff has failed to sustain its burden of proving that the personal choice springs were unlawfully converted by the defendants; neither Exhibit P–128 nor the testimony of Mr. Smiles support the conversion claim.

An earlier SVMC contract with St. Louis called for the SVMC to supply 1,230 comb bars; that order was placed by St. Louis in November 1971. It is not clear from Exhibit P–128 that the personal choice slide-bar springs were, in fact, sent on a "no-charge" basis. The invoice simply states "N/C WITH COMB BARS." Mr. Smiles explained that a comb bar is a device that allows a voter to leave the voting machine after having cast a referendum vote without having cast a vote for any candidate. N.T. 4–80. While functionally there is no connection between a comb bar and a personal choice slide-bar spring, the number of such springs shipped more closely corresponds to the number of comb bars specified in the St. Louis order, Exhibit P–84A, there being a ratio of one comb bar per machine. While it is possible that more than one personal choice spring was to be used per machine in St. Louis, and that this correlation between the number of comb bars and personal choice springs is not decisive, in light of the fact that the Ransom F. Shoup & Co., Inc. contract with St. Louis, Exhibit P–88A, and the invoice of that company to St. Louis, Exhibit P–87A, do not cite personal choice springs, I find that plaintiff failed to sustain its burden of proving that the personal choice springs were shipped by Ransom F. Shoup II on a

no-charge basis in order to enable his father to complete his St. Louis contract.

#### c. Malden, Massachusetts Interlocks

124. I find that plaintiff failed to sustain its burden of proving that Ransom F. Shoup II, while president of the SVMC, obtained a contract from Malden, Massachusetts, for endorsement interlocks, or that he arranged for his father's company to supply that contract.

#### d. Storage of Voting Machines in North Carolina

125. In connection with his election and service work for the SVMC, Ransom F. Shoup stored SVMC voting machines in his boat company plant in Ahoskie, North Carolina. It is clear that these machines were not stored by Ransom F. Shoup with the intent to use them on his own behalf or with the intent to deprive the SVMC of their use, but rather as a convenience to the corporation. I find that the storage of the machines was clearly justifiable in light of the election and repair work that employees at the boat company did on behalf of plaintiff or its predecessors.

126. Plaintiff is entitled to the return of these machines on payment of a reasonable storage charge to the defendants. Transportation of the machines will be at plaintiff's expense.

### COUNTERCLAIMS

#### Royalties Counterclaim

127. In connection with my former Findings and Conclusions concerning the September 22, 1955 agreement, I find that the employer's obligation to pay a royalty became effective on the date that the employer terminated Ransom F. Shoup. I find that from the date of his termination until his death in August 1977, Ransom F. Shoup was in competition with the employer. The employer's royalty obligation existed only during such time as Ransom F. Shoup was not in competition with the employer, hence, I conclude that Ransom F. Shoup's estate is not entitled to collect any royalties from the plaintiff.

#### Defamation, Antitrust, and Interference with Defendants' Contractual Relationships Counterclaims

128. While the conduct of the plaintiff and defendants, as they competed against each other, was at times reprehensible, and while plaintiff no doubt would prefer not to have to compete with the defendants, I find that there is no evidence to support the defendants' counterclaims alleging defamation or antitrust violations.

129. I find that defendants failed to meet their burden of proving that plaintiff interfered with defendants' contractual relationships.

### CONCLUSION

An appropriate Order will be entered.