**UNITED STATES JAYCEES, a non-profit Missouri Corporation, and Pennsylvania Junior Chamber of Commerce, a non-profit Pennsylvania Corporation, Appellants,**

v.

**PHILADELPHIA JAYCEES, a non-profit Pennsylvania Corporation.**

No. 80–1201.

United States Court of Appeals, Third Circuit.

Argued Oct. 17, 1980.

Decided Jan. 30, 1981.

Rehearing Denied March 4, 1981.

Robert B. Washburn, Rosemary M. Miano, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Patrick J. Broderick, Broderick & Karaszkiewicz, Philadelphia, Pa., Carl D. Hall (argued), Hall, Sublett, McCormick & Andrew, Paul H. Johnson, Head & Johnson, Tulsa, Okl., for appellants.

Bruce A. Cohen (argued), Dechert Price & Rhoads, Philadelphia, Pa., for appellee.

Before GIBBONS and ROSENN, Circuit Judges, and WEBER,* District Judge.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal raises the question of whether a subordinate chapter of a national organization may continue to use the national organization's trademark after the subordinate's disaffiliation without violating the Trademark Act of 1946 (Lanham Act), 15 U.S.C. §§ 1051–1127 (1976). The United States Jaycees (the National) instituted a trademark action in the United States District Court for the Eastern District of Pennsylvania against its former Philadelphia chapter to enjoin the infringement of its trademarks by the chapter's use of the name "Jaycee," and related trademarks. The district court found an infringement but granted only a narrow injunction that permitted the Philadelphia group to continue to use the name "Jaycee" albeit with the prefix "Philadelphia." 490 F.Supp. 688 (E.D.Pa.1979). We believe the limited order of the district court constituted error and we therefore vacate it and remand with directions to grant the relief requested.

* Honorable Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation.

## I.

This case, like a number of others throughout the country, arose primarily because of an ideological split in the membership of the Jaycees. The Jaycees, organized on local, state, and national levels, is a civic group engaged in "organizing and holding meetings, competitions and other special events for young men interested in the affairs and improvement of their communities, with the purpose of fostering interest in the community betterment programs at the local, state and national levels, as well as offering leadership experience to the members." 490 F.Supp. at 691. Established in the halcyon days of the 1920s, the United States Jaycees limited membership to young men, as have the various state Jaycee organizations, including the Pennsylvania Junior Chamber of Commerce. Under the prescribed structure, only young men have been able to exercise full membership rights. Although women have been allowed to participate in some Jaycee activities, as non-members they cannot, however, vote, hold office or take part in Jaycee decision-making.

Approximately ten years ago, a number of local chapters, dissatisfied with these restrictions, admitted women to full membership. Two significant developments have since occurred. First, the national organization revoked the charters of many local chapters admitting women, including that of the defendant Philadelphia Jaycees. Second, a number of local chapters, having had their charters revoked or facing revocation if they admitted women, sued the national organization alleging that the prohibition against women members and its enforcement by revocation of charter violated the civil rights of members and, hence, were unconstitutional. These challenges have been uniformly unsuccessful because plaintiffs have failed to establish state action.

1. The Philadelphia Jaycees were intervenors in *Junior Chamber of Commerce of Rochester, Inc., supra.*

2. In light of the Philadelphia Jaycees' participation in *Junior Chamber of Commerce of Rochester, Inc. v. United States Jaycees*, 495 F.2d

*See, e. g., New York City Jaycees, Inc. v. United States Jaycees, Inc.*, 512 F.2d 856 (2d Cir. 1975); *Junior Chamber of Commerce of Kansas City v. Missouri State Junior Chamber of Commerce*, 508 F.2d 1031 (8th Cir. 1975); *Junior Chamber of Commerce of Rochester, Inc. v. United States Jaycees*, 495 F.2d 883 (10th Cir.), *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974).[1]

The conflict between the particular parties to this dispute began on August 11, 1972, when the Philadelphia Jaycees amended its bylaws to permit female members. This amendment violated the United States Jaycees bylaw prohibiting local amendments "inconsistent with any requirements for affiliation," and subjecting such local chapter violators to revocation of their charters. 490 F.Supp. at 691–92. One of the requirements for affiliation, throughout the 35 year period the Philadelphia Jaycees was chartered by the National, was that individual members be males under 36 years of age. *Id.* at 691. The Philadelphia Jaycees admitted its first female member in September 1972, admittedly in violation of the National's bylaws. *Id.* On June 26, 1973, the United States Jaycees revoked the charter of the Philadelphia Jaycees. *Id.* The sole reason for the disaffiliation was the disagreement over the admission of women. *Id.* at 693. Since that revocation, the parties have unsuccessfully attempted to reconcile their differences, each adhering to its stated position on the admission of women. *Id.* at 692.

This action, filed October 1, 1978, does not directly challenge the National's membership policy or its revocation of the charter of the Philadelphia group.[2] Rather, in this case, the national and Pennsylvania state organizations sought an injunction under the Lanham Act barring the disaffiliated Philadelphia group from using the name

883 (10th Cir.), *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974), the Philadelphia group might well be barred now from directly attacking those actions under the doctrine of res judicata. However, we do not need to decide that question in this case.

"Jaycees" and a variety of related trademarks. The United States Jaycees owns the mark "Jaycees." That mark, alone and in combination with designs and other words, is registered with the United States Patent and Trademark Office. 490 F.Supp. at 691. As the district court stated, the federal registration created a presumption of the validity of those marks and of the United States Jaycees' exclusive right of ownership. Further, at least some of those marks have become incontestable under 15 U.S.C. § 1115(b) (1976). 490 F.Supp. at 694. The Philadelphia Jaycees argued, however, that despite the National's ownership of incontestable exclusive rights to those marks, the Philadelphia group should be permitted to continue to use the name "Jaycees."

The Philadelphia Jaycees offered two arguments to the district court in favor of its position. First, it argued that an order allowing such use was within the equitable discretion of the court, particularly in light of (1) the goodwill the chapter had built in the name "Philadelphia Jaycees"; (2) the slight likelihood of confusion from the continued use as compared with the great likelihood of confusion if it had to change its name; and (3) the underlying cause of the disaffiliation that led to the trademark action, the National Jaycees' discriminatory membership policy. Second, the Philadelphia group contended that an injunction barring use of the name "Jaycee" would aid the United States Jaycees in enforcing its discriminatory membership policy and that such aid would be unconstitutional under the doctrine announced in *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

The district court, although accepting the National's contention that it has incontestable rights in the trademarks in dispute, declined to enjoin the Philadelphia group's use of the name "Jaycees." The court adopted both arguments advanced by the Philadelphia Jaycees, and, although it found infringement, issued only a limited injunction. The court ordered only that the local group (1) always use "Philadelphia" with "Jaycees" and (2) make clear in printed material that it disseminates that it is not affiliated with the National.

The United States Jaycees and the Pennsylvania Junior Chamber of Commerce appealed, arguing that under the Lanham Act the narrow injunction is an abuse of equitable discretion and that *Shelley v. Kraemer, supra*, does not require such a limited order.

## II.

■ The Lanham Act makes any persons using registered trademarks without the consent of the registrant liable in a civil action. 15 U.S.C. § 1114(1) (1976). The district court found that the United States Jaycees is the registrant of a number of valid trademarks and that several of these marks have become incontestable under 15 U.S.C. § 1065. 490 F.Supp. at 694. The Philadelphia Jaycees have not appealed from that finding. Once a mark has become incontestable, "the registration shall be conclusive evidence of registrant's *exclusive* right to use the registered mark in commerce . . . ." 15 U.S.C. § 1115(b) (emphasis added).[3] The infringement of such a mark, according to the Act, is subject to only seven enumerated defenses. *Id.* Only one of these defenses, abandonment, *id.* § 1115(b)(2), was urged by the defendant at any time during these proceedings.[4] We

---

**3.** The National and the Philadelphia Jaycees dispute the effect of incontestability, a question addressed squarely in *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). We agree with that court that incontestability properly may be considered in an infringement action. The district court's finding of incontestability does limit the defenses available to the Philadelphia Jaycees. We agree with the Philadelphia group, however,

that incontestability neither makes unnecessary a showing of likelihood of confusion, nor precludes all discretion in the fashioning of injunctive relief. But because incontestability does bear on the strength of a mark, it is relevant to those two issues and we bear in mind in reaching our decision that several of the marks are incontestable.

**4.** In defendant's answer filed November 29, 1978, the Philadelphia Jaycees advanced the affirmative defense of abandonment. In subse-

shall first consider the claim of abandonment.

## III.

The National revoked the charter of its Philadelphia chapter on June 26, 1973, 490 F.Supp. at 691, but did not file this trademark action until more than five years later, on October 1, 1978. Admittedly, during part of this period the National was attempting by negotiations, albeit unsuccessfully, to reconcile the differences between the two organizations. *Id.* at 692. Nonetheless, the Philadelphia Jaycees are technically correct that the National did not promptly enforce its trademark rights. Further, despite the revocation, the United States Jaycees continued to correspond with the "Philadelphia Jaycees," addressing the local organization as such, and to supply the Philadelphia group with organizational accoutrements. *Id.* at 693. Also, on one occasion, the National requested the aid of the Philadelphia group in promoting a National-sponsored television program. *Id.* Furthermore, the United States Jaycees have been tolerant of other chapters admitting women. There was evidence that the National had allowed some of its major chapters to remain affiliated or at least to use the name "Jaycee," despite their admission of women. *Id.* Based on these actions of the National toward the Philadelphia group and toward other chapters admitting women, the Philadelphia Jaycees assert that the National has abandoned its trademark in the name "Jaycees." [5] We disagree.

The Lanham Act provides:

A mark shall be deemed to be "abandoned"—

(a) When its use has been discontinued with *intent not to resume.* Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.

15 U.S.C. § 1127 (1976) (emphasis added). This defense to infringement claims has long received recognition and its elements are well known to the courts.

To establish the defence of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon. Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed.

*Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 31, 21 S.Ct. 7, 11–12, 45 L.Ed. 60 (1900). In *Baglin v. Cusenier Co.,* 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863 (1911), the famous case concerning the right to use the name "Chartreuse," the Court, in elaborating on the *Saxlehner* language, emphasized that "[t]here must be an *intent* to abandon, or the property is not lost; and while, of course, as in other cases, intent may be inferred when the facts are shown, yet the facts must be adequate to support the finding." *Id.* at 597–98, 31 S.Ct. at 673–674 (emphasis original). This twin requirement of non-use and intent to abandon is embodied in section (a) of the statutory definition of abandonment. The two-part test remains valid today. *Old Swiss House, Inc. v.*

---

quent briefs and memoranda to both the trial court and this court, although the Philadelphia Jaycees argued that equitable doctrines of laches, waiver, estoppel and acquiescence barred plaintiffs' request for an injunction, the group did not pursue its abandonment claim. That defense, however, was raised at oral argument in this court, and both sides, by letter, have provided additional briefing on the question. Although the district court did not have an opportunity to address this claim, in the interest of judicial economy we will consider it.

**5.** This evidence of occasional tolerance of chapters admitting women and of the failure to litigate quickly alleged trademark infringements might arguably support claims of laches, waiver, estoppel or acquiescence. We, however, express no views on such claims. The district court did not accept any of these arguments when advanced by the Philadelphia Jaycees and the group has not appealed that rejection.

*Anheuser-Busch, Inc.,* 569 F.2d 1130, 1133 (C.C.P.A.1978); *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 124 (5th Cir. 1973); *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 363 (2d Cir. 1959).

■ We believe the Philadelphia Jaycees cannot show either the non-use or the intent to abandon that must be proved under the case law and section (a) of the statutory definition of abandonment. In reaching this conclusion, we also bear in mind that abandonment, being in the nature of a forfeiture, must be strictly proved. *P.A.B. Produits et Appareils de Beaute v. Satinine Societa in Nome Collettivo di S.A. e. M. Usellini,* 570 F.2d 328, 332–33 (C.C.P.A. 1978).

■ Non-use means much more than failure to prosecute promptly trademark infringements, and even total, but temporary non-use of a name has, at times, been found insufficient to support a finding of abandonment. *Beech-Nut Packing Co. v. P. Lorillard Co.,* 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810 (1927). That the United States Jaycees has tolerated some of its disaffiliated or disobedient chapters in the use of its marks does not constitute non-use. Consistent and proper use of those marks elsewhere in the United States, *see* 490 F.Supp. at 690, defeats any claim of non-use. *Dawn Donut Co., supra,* 267 F.2d at 363 (abandonment occurs only when registrant fails to use its mark anywhere in the nation); *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 878–79 (E.D.N.Y.1978) (no abandonment of mark used elsewhere in the United States). These marks have been used consistently by the more than 9,000 affiliated Jaycee chapters, 490 F.Supp. at 690, including the more than 350 in Pennsylvania, the state in which the marks allegedly have been abandoned. Included among these is the Pennsylvania Junior Chamber of Commerce, a plaintiff in these proceedings. The Philadelphia Jaycees do not dispute these facts.[6]

The second requirement for a showing of abandonment under section (a) of the statutory definition is intent to abandon. We find no evidence of such intent, nor are there any facts that could support such a finding. On the contrary, this and other legal efforts of the United States Jaycees definitely indicate an intent to retain exclusive use of its marks. In fact, during a substantial period following the termination of the defendant's charter, the National was engaged in litigating claims by other chapters over their disaffiliation, including one case in which this very defendant had intervened. *See* note 1 *supra* and accompanying text. As a matter of law, the Philadelphia Jaycees, proving neither non-use, nor intent to abandon, has failed to show abandonment under section (a) of the statute.

■ Nor do we believe that the United States Jaycees has abandoned its marks by any acts of commission or omission causing the marks at issue to lose their significance as indications of origin, the type of abandonment defined in section (b) of the statute. By reason of their affiliation with the National, state and local Jaycee chapters are permitted, actually licensed, to use Jaycee trademarks.[7] In analyzing the actions

6. The dissent relies on *Sheila's Shine Products, Inc., supra,* as an example of regional abandonment, but that court accepted only the idea that "a state is an appropriate territory by which to define trade areas" for the determination of whether an abandonment has occurred. It seems to us that whether a state is an appropriate geographical area by which to define a trade area for purposes of abandonment depends upon the facts of the particular case. To find an abandonment here, however, a court would have to accept the theory that a trademark abandonment could occur within an area as small as a single city. We see no basis upon which to accept such a theory in this case.

7. The district court found as facts that state and local chapters affiliated with the United States Jaycees were permitted during the term of the affiliation to use the National's trade and service marks. 490 F.Supp. at 691. Thus some type of license agreement existed. Further, the court found, one of the bylaws of the United States Jaycees stated that "maintaining affiliation shall constitute a waiver of all rights to the name Jaycees and/or Junior Chamber of Commerce in the event the local organization member at any time for any reason ceases to main-

of the United States Jaycees toward these licensees, we recognize that either naked licensing or licensing without reasonable control can work an abandonment. *Sheila's Shine Products, Inc., supra*, 486 F.2d at 123–24; *Dawn Donut Co., supra*, 267 F.2d at 367. Admittedly, the National, although revoking the charters of several chapters that have violated its bylaws limiting membership to men, apparently has allowed other violators to remain affiliated.[8] Despite this, we do not believe the National can be found to have exhibited such insufficient control as to support a finding of abandonment.

As the Ninth Circuit observed in *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977), the proponent of a claim of insufficient control must meet a high burden of proof. The purpose of the control requirement is the protection of the public. If a licensor does not maintain control of his licensees in their use of the license, the public may be damaged by products that, despite their trademark, do not have the normal quality of such goods. "The amount of control required varies with the circumstances." *Id.* at 1060. In this case, the Philadelphia group admittedly has not offered a lower quality of service. 490 F.Supp. at 692. Nor is there any evidence that other dissident, but unchastised chapters have deviated substantially from Jaycee standards of conduct. Under these circumstances, we do

not believe that a delay, even of several years, in revoking charters or pressing trademark infringement claims, constitutes a loss of control sufficient to prove abandonment. Other courts have reached the same conclusion. *Edwin K. Williams & Co., Inc., supra*, 542 F.2d at 1059–60; *Sheila's Shine Products, Inc., supra*, 486 F.2d at 125 (three or four years lapse in exercise of control not enough to work abandonment).

In reaching this decision, we note that to approximately 386,000 men, members of 9,200 affiliated local Jaycee chapters and 50 state Jaycee chapters, 490 F.Supp. at 690, the significance and use of the marks as symbols of their organization remains very strong. We thus do not believe that the Philadelphia Jaycees have proved abandonment under section (b) of the statutory definition. We conclude that, although the United States Jaycees did display a degree of tolerance toward some of its disobedient chapters in the use of its marks, such conduct did not constitute non-use and did not demonstrate an intent to abandon, nor did it cause its marks to lose their significance. The National therefore has not abandoned its marks.

### IV.

We turn to the other questions on appeal: whether it was error to grant a narrow injunction and whether the grant of a broad injunction would have been unconstitutional. When a violation of the Lanham Act has been found, both damages and injunction are appropriate relief. 15 U.S.C.

---

tain a U. S. Jaycees charter." *Id.* at 692. The same bylaw also directs an officer of the National to take "steps to create a binding [express] contractual relationship between the Corporation and each Local Organization Member regarding such waiver," *id.*, but it is admitted that there never was created such an express contract between the Philadelphia and United States Jaycees. *Id.* The district court concluded that the Philadelphia Jaycees are not contractually bound to cease use of the "Jaycee" name, but we believe it is helpful to examine the relationship between the two groups for what it is, a license agreement.

**8.** We observe, gratuitous though it may be, that the position of the United States Jaycees and Pennsylvania Junior Chamber of Commerce on

the exclusion of women is difficult to understand. We note that a good number of major Jaycee chapters, such as those in Boston, Greater Hartford, Omaha, New York, Minneapolis and Kansas City, have refused to follow the National's directive to exclude women on the basis of their sex. Further we observe that 75 local chapters still affiliated with the United States Jaycees have admitted women in disregard of the bylaw on membership. 490 F.Supp. at 693. If the national organization retains this membership limitation and continues its policy of revoking charters and litigating trademark use by disaffiliated chapters, conceivably the United States Jaycees may soon be an organization literally in name only.

§§ 1116 & 1117 (1976). In the case at bar, the National has dropped any claim to damages. The Philadelphia Jaycees have not appealed the district court's decision that there was an infringement, other than by raising the abandonment claim already discussed. Further, if there is an infringement, the Philadelphia group admits that injunctive relief is appropriate. All that remains at issue, is the scope of that relief.

The Act provides:

> The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.

*Id.* § 1116. Relying on its power to fashion reasonable relief the district court ordered that:

> 1. The organization presently known as the Philadelphia Jaycees is PERMANENTLY ENJOINED from using the trademark "JAYCEE" or "JAYCEES" or any phonetic equivalents thereof, UNLESS such mark is preceded by the word "PHILADELPHIA" in print, type, or voice equal to that used for the trademark.

> 2. The organization presently known as the Philadelphia Jaycees is PERMANENTLY ENJOINED from using the trademark "JAYCEE," "JAYCEES," or any phonetic equivalent on any membership applications, literature soliciting members or donations, or advertising, UNLESS within such application, literature or advertising is printed in type no smaller than the type used for the majority of the material in the application, literature, or advertising, and within close proximity to the name of the organization, that the organization is "NOT AFFILIATED WITH THE UNITED STATES JAYCEES OR THE PENNSYLVANIA JUNIOR CHAMBER OF COMMERCE."

> 3. The organization presently known as the Philadelphia Jaycees is PERMANENTLY ENJOINED from accepting orally solicited contributions UNLESS the contributor is informed that the Philadelphia Jaycees are not affiliated with the United States Jaycees or the Pennsylvania Junior Chamber of Commerce.

490 F.Supp. at 693.

■ An injunction is an exercise of equitable power. For an appellate court to modify or vacate an injunction there must be a showing of abuse of discretion. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 193–95, 98 S.Ct. 2279, 2301–2302, 57 L.Ed.2d 117 (1978) (equitable remedies usually discretionary, balancing of equities and hardships generally appropriate, but discretion still limited); *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897–898, 97 L.Ed. 1303 (1953); *United States v. Article of Drug Designated B-Complex Cholinos Capsules*, 362 F.2d 923, 928 (3d Cir. 1966); *Frostie Co. v. Dr. Pepper Co.*, 361 F.2d 124, 127 (5th Cir. 1966) (trademarks). This court must decide whether the trial court, in allowing the Philadelphia Jaycees to continue to use the name "Jaycees," has abused its discretion.

As we have noted, the district court concluded that the United States Jaycees have several valid and incontestable trademarks, including a trademark in the name "Jaycee." Yet the court declined to enjoin the Philadelphia Jaycees from use of the name. The trial court found that the local group had built up goodwill in the name and that, specifically, it was known as the sponsor of the Philadelphia Special Olympics. By this goodwill, the court held, the group had established a "secondary meaning" in the name "Philadelphia Jaycees." Seeking to protect this meaning, as well as the admittedly valid trademark rights of the national organization, the district court fashioned its compromise order. The principle it sought to advance in this compromise was elimination of confusion. The court reasoned that, although it is confusing to have the disaffiliated group continue to use the National's trademarked name, it would be as confus-

ing, particularly to persons seeking the organization that sponsors the Special Olympics, to require the local group to use a different name. Thus, the court shaped the limited order.

We recognize the district court's praiseworthy objective, but we believe that its analysis is flawed. Although avoidance of confusion should always be a major concern of a court in a trademark case, it is not the overriding principle when the court is confronted with firm statutory rights. Further, actual confusion need not be shown. Rather only the likelihood of confusion is required. *Family Circle, Inc. v. Family Circle Associates, Inc.*, 332 F.2d 534, 539–40 (3d Cir. 1964). We perceive that there is great likelihood of confusion when an infringer uses the exact trademark, in this case, "Jaycees." The requirement that "Philadelphia" always be used with "Jaycees" does not alleviate the confusion when commonly the trademarked name is preceded by a geographic identification. In addition, the court's concern with the possible injury caused to the Philadelphia group by confusion if it is required to change its name is misplaced. Protection of infringers is not a purpose of the Lanham Act. On the contrary, the Act's objective is the protection of the trademark and the public. Thus, we hold that the avoidance of confusion to the infringer's interests cannot support an order permitting the continued use of the trademark even if it is in juxtaposition with the infringer's locale and accompanied by a disclaimer of affiliation with the trademark owner.

The district court also erred because this case, controlled by clear statutory rights, is not dependent on statutory or common law secondary meaning. "Secondary meaning" is the creation of a meaning in a common term so that, in the public's mind, the term connotes a particular source. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir. 1978). The secondary meaning approach is found only when rights are asserted in *non*-distinctive marks and terms. Such marks and terms can be protected only on a showing of sec-

ondary meaning. For example, in *Scott Paper Co., supra*, this court held that the use of "Scott's" by a furniture polish maker did not infringe on the trademark of the Scott Paper Company in that name. The name Scott is a common name, descriptive of the originators of the products. Scott Paper Company has a valid trademark, one based on the secondary meaning the Scott name has attained in the paper industry. But rights based on secondary meaning in such a common name are not unlimited. This court concluded that use of the name by Scott's Liquid Gold, Inc., a use begun years before and originating independently, *not* as a replica of the paper company's name, did not infringe the latter's trademark because the name was used in a product line, furniture polish, in which the paper company's name had not achieved secondary meaning.

In cases involving conflicts between independently derived names consisting of common terms protectable only if secondary meanings have been obtained, courts properly have considerable leeway in fashioning relief. In one such case, *Everest & Jennings, Inc. v. E & J Manufacturing Co.*, 263 F.2d 254, 260 (9th Cir. 1958), *cert. denied*, 360 U.S. 902, 79 S.Ct. 1284, 3 L.Ed.2d 1254 (1959), the plaintiff, holder of the registered mark "E & J," objected to defendant's use of "E–J." Each company had derived the mark independently, based on the initials in each case of the founders. The two companies were not direct competitors, but both were makers of medical equipment. The trial court enjoined the infringer from using the mark on stationery, in advertising, or in any other way, *except* on diecast footpads of the wheelchairs it made. The court of appeals sustained this injunction.

These cases do not help the Philadelphia Jaycees and do not support the district court's order because the National's claim to protection does not depend on an assertion of secondary meaning. This is not a case where the conflicting parties independently adopted similar names. The Philadelphia group had the right to use the name "Jaycees" and the various marks only

by its affiliation with the National. The Philadelphia Jaycees, while affiliated with the National, was licensed to use the trademarks. *See* note 7 *supra.* Once a license has expired, use of the formerly licensed trademark constitutes infringement. *Professional Golfers Association v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670 (5th Cir. 1975). To say that the licensee has acquired rights that survive the legal termination of that license, destroys the entire concept of a license. The district court, in concluding that the successful use of a name by a licensee can create a "secondary meaning" in the term to which it is entitled to protection, misconstrues the doctrine of secondary meaning. No rights are established by such use. If there are no conflicting rights, the United States Jaycees are entitled to a broad injunction.

Secondary meaning analysis is inappropriate here for another reason. The terms and marks at issue are not the common, non-distinctive types usually requiring secondary meaning analysis. Although the term "Jaycee" originally came from "J. C.," standing for "Junior Citizen," (not "Junior Chamber of Commerce," which is what most Jaycee organizations were first called), it has long had a strong, individual meaning and in its present form should be considered a fanciful, not common, name. In *Everest & Jennings, supra,* the court stated that "[t]he right to an all-inclusive injunction barring all use of the mark is not absolute where the mark is not fanciful and strong, but as in this case descriptive, weak, and dependent on the showing of secondary meaning for protection." 263 F.2d at 260. However, this suggests that where the mark is fanciful and strong, as in this case, a broad injunction is appropriate. We agree.

No cases relied on by the Philadelphia Jaycees or the district court support the range of discretion exercised by the court. Most involved common names. *E. g., Wrist-Rocket Manufacturing Co. v. Saunders Archery Co.,* 578 F.2d 727 (8th Cir. 1978); *Motor Master Products Corp. v. Motor Masters Warehouse, Inc.,* 463 F.Supp. 232 (E.D.Pa.1978). Others turn on complaints of infringement of common law trademarks, *e. g., Quality Weaving Co. v. Regan,* 245 Pa.Super. 66, 369 A.2d 296 (1976), not statutory trademarks. The several cases involving the splintering of group organizations, leading to contests over the use of similar names, *e. g., Perham v. Richman,* 158 F. 546 (C.C.E.D.Pa.1907), do not implicate incontestable Lanham Act rights. Further, the use of a *similar* name is more likely to survive a challenge than the infringing use of the *exact* trademarked name such as "Jaycees."

Permitting the district court's limited order in this case renders the Lanham Act protection meaningless. At issue is the allegedly infringing use of a fanciful name, "Jaycees," widely known throughout the nation. Through the Philadelphia group's affiliation with the national organization, the local chapter had the right to use the mark. In effect, they were licensed to use the marks in dispute. That affiliation was terminated for what the Philadelphia group claims is an improper reason. Ordinarily, a licensee's right to use a licensor's trademark expires with the termination of their agreement. Under the district court's holding, if a terminated licensee can show to a court's satisfaction that underlying the termination was discrimination in admission to membership, although *not* unlawful, then the licensee can retain the use of the licensor's mark. Thus, a licensor could lawfully terminate a licensee but enforcement of the termination would be frustrated. This we cannot accept.

The United States Jaycees have an exclusive right to the mark. No permissible defense has been claimed, other than the abandonment claim which we have rejected. The term does not depend on secondary meaning. We hold that a strong and fanciful mark is entitled to broad protection and that it is error to deny a broad injunction barring all use by the Philadelphia group of the name "Jaycee." That error constitutes a reversible abuse of discretion.

**V.**

The Philadelphia Jaycees argue that even if the Lanham Act entitled the United

States Jaycees to broad injunctive relief, such relief cannot be granted because it would be unconstitutional for the courts to grant that relief under the doctrine of *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The district court found that the purpose of United States Jaycees' trademark action was to gain a further tool with which to enforce its discriminatory membership rule. 490 F.Supp. at 693. Admittedly, the United States Jaycees limit membership to men under 36. When a local chapter admits women, the National revokes the local's charter, thereby disaffiliating itself from the local. Disaffiliation is the penalty the National imposes on locals for violation of the membership rule. Obviously, the threat of disaffiliation alone has not prevented all local chapters from admitting women. Although disaffiliated, the Philadelphia group continued to use the name Jaycees. According to the court, the National believes, and is correct in its belief, that the additional sanction available under the Lanham Act of enjoining disaffiliated groups from using the Jaycees' name and mark, will further dissuade local chapters from admitting women.

The district court, assuming the purpose of the action to be enforcement of the Jaycees' no-women policy, found that aiding enforcement of that policy by imposing the protection of the Lanham Act would violate the principle set forth in *Shelley v. Kraemer, supra*. Therefore, it held that judicial enforcement of discriminatorily restrictive agreements denies victims of that discrimination equal protection of the laws. 334 U.S. at 20, 68 S.Ct. at 845. In *Shelley*, the Supreme Court found that the Missouri courts could not constitutionally enforce restrictive agreements in deeds to land that had the effect of preventing the sale of any lots in a neighborhood to non-Caucasians. The Missouri Supreme Court had held that the state trial court should have enjoined the Shelleys, who were black, from taking possession of a lot that they had purchased, the deed for it specifically prohibiting conveyance to non-Caucasians. The Court disagreed, holding that state courts may not constitutionally enforce such agreements.

In rejecting the plaintiffs' claim that denial of the injunction deprived them of constitutional rights, the Court stated that "[t]he Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." 334 U.S. at 22, 68 S.Ct. at 846.

The Court has had several opportunities to reconsider *Shelley*. In *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), the Court held that *Shelley*-type covenants could no more support damage claims when breached than they could support injunctions. In *Griffin v. Maryland*, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), the setting for the discriminatory action was a privately held amusement park that admittedly advertised widely, was open to the public, and gave no notice of discriminatory exclusions, but which did prohibit blacks from using its rides. When a number of blacks refused to leave a ride for which they had tickets they were arrested as disorderly by a security employee of the park who had been made a deputy sheriff. The Court reversed their conviction, finding the arrests to be state action enforcing discrimination.

Two cases in the late 1960s extended *Shelley* to referendums adopted by voters. In *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the Court struck down amendments to a state constitution and city charter, respectively, that would have prevented local government from combatting racial discrimination in housing. In *Reitman*, the decision rested on *Shelley* and the California Supreme Court's holding of racially discriminatory intent. In *Hunter* the challenged provision was facially an impermissible classification on the basis of race.

The most recent important decision among the *Shelley* progeny is *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), in which the Court refused to find *Shelley*-type state action in a state's grant of a liquor license to a white-only club. The Court did, however,

strike down a state regulation that required that "[e]very club licensee shall adhere to all of the provisions of its Constitution and Bylaws," Reg. of Pa. Liquor Control Bd. § 113.09 (June 1970 ed.). 407 U.S. at 177–79, 92 S.Ct. at 1973–1974. What confronts this court now is whether a federal district court's enforcement of undisputed rights in trademarks under the Lanham Act is comparable to the state action found unconstitutional in the *Shelley* line of cases.

▆▆▆ The discrimination alleged is the National's exclusion of women from membership.[9] This case, however, centers on the infringement of trademark rights. The exclusion of women is wholly independent of the protection provided by the Lanham Act to trademarks. The action terminating the Philadelphia charter for admitting women to membership was not dependent on the Lanham Act. Nor would a decision in this Lanham Act case favorable to the Philadelphia Jaycees alter the fact of the discrimination; it would not restore the Philadelphia chapter's affiliation or change the National's membership policy. This lack of a substantial relationship between the state action complained of—the Lanham Act enforcement—and the alleged discrimination distinguishes this case from *Shelley* and its progeny.[10]

The cases discussed above concern quite different state action. *Reitman* and *Hunter* involved state provisions plainly furthering discrimination. In contrast, the state action here, the injunction, does not affect the discrimination that led to the disaffiliation or the revocation of the charter. *Shelley* and *Barrows* also do not support the district court's denial of enforcement of Lanham Act rights. In those cases the courts were asked to remedy breaches of patently discriminatory agreements, by injunction in *Shelley* and by damages in *Barrows*. To reiterate, here, enforcement by injunction of Lanham Act rights does not implement the discrimination complained of. This is the major flaw with the Philadelphia Jaycee's argument: the discrimination alleged is too far removed from the remedy sought by plaintiffs, an injunction against trademark infringement. The revocation of the Philadelphia chapter's charter is history. The outcome of this Lanham Act case directly affects neither the retention of the sexually discriminatory policy, nor the disaffiliation of the local group.

*Griffin*, the amusement park case, does not strengthen the argument of the Philadelphia Jaycees. The state action there, the deputy's arrest of blacks ignoring the color bar, would be analogous to the state action in this case only if the National had sought to impose penal sanctions on members of chapters admitting women. Here, rather, the plaintiff is seeking only the termination of infringement of its trademarks. The conduct the National seeks to have enjoined is the Philadelphia group's use of the name and symbols of an organization with which it has no affiliation. Whatever the reason for the disaffiliation, the confrontation over admission to membership has long since passed; it is something that already has been accomplished. Thus, the injunction in no way furthers this discrimination.

*Moose Lodge* confirms this analysis. Just as grant of a liquor license is too far removed from membership discrimination to be actionable, so is enforcement of trademark rights. The invalidation of the state regulation does not support a different re-

---

**9.** As we have noted, *see* note 2 *supra*, an attempt by the Philadelphia Jaycees to challenge directly that discrimination might be barred as res judicata. We do not believe, however, that the Philadelphia group's argument based on *Shelley* is barred by that doctrine. The "state action" complained of and found absent in *Junior Chamber of Commerce of Rochester, Inc. v. United States Jaycees*, 495 F.2d 883 (10th Cir.), *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974), was unilateral discrimination by the National, an organization which admittedly received some government funds. This is different from the state action complained of in this case, a federal court injunction. Thus we must reach the merits of the Philadelphia chapter's *Shelley* argument.

**10.** We note that throughout the many years of Lanham Act litigation, this apparently is the first case in which a party has urged that an injunction against alleged infringement would violate the *Shelley* doctrine.

sult. Under the regulation, a lodge violating its bylaws by admitting blacks could lose its liquor license. That regulation was properly struck down. The Philadelphia Jaycees have faced no state or federal penalties because they admitted women. They did, however, lose their charter and affiliation with the national group. That is not challenged. Having lost that affiliation, they cannot complain when they lose the private privileges incident to affiliation. The use of the name "Jaycees" was one of these. We therefore hold that judicial enforcement of violations of the Lanham Act is not precluded, even though the charter of a chapter of an organization is terminated because the chapter violated the sexually discriminatory policies of its national organization.

## VI.

We conclude that the United States Jaycees have not abandoned the trademarks at issue in this case, that the district court erred in refusing to grant a broad injunction, and that enforcement of these trademark rights does not violate the doctrine announced in *Shelley v. Kraemer, supra*.

The order of the district court will be vacated and the case remanded with directions to permanently enjoin the defendants from using the trademark "Jaycee" or "Jaycees" and for such other relief as is consistent with this opinion.

GIBBONS, Circuit Judge, dissenting:

My disagreement with the majority is a narrow one. I agree that if there was no abandonment of the Jaycee trademark by the United States Jaycees, the injunction issued by the district court is entirely too narrow, and an injunction as broad as that ordered by the majority is required by the Lanham Act. I also agree that there is no merit to the defendant's constitutional objection to Lanham Act enforcement.

Indeed my analysis of the latter issue is less complicated than that of the majority opinion. *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) and *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1935) might well prevent a court from issuing on behalf of the United States Jaycees an injunction prohibiting one of its chapters from admitting women. But those cases do not remove it or any other private discriminator from the protections afforded by the law of torts. Protecting a private discriminator from having his windows broken or his person assaulted involves the state in the reenforcement of his discrimination in a manner far too remote to fall within those authorities. Trademark infringement is a tort, directed not only against the trademark owner but against members of the public who may be confused by it. The trademark is neutral. The private discrimination of the owner of an entirely neutral trademark does not make it an outlaw. Thus I agree that in relying on *Shelley v. Kraemer, supra*, the trial court erred.

Where I part company with the majority is in what I think is an overly protective approach on the issue of abandonment. I agree that there is no evidence that the United States Jaycees abandoned their incontestable trademarks nationally. But a more refined test may be appropriate. The Act provides:

A mark shall be deemed to be "abandoned"—

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.

15 U.S.C. § 1127 (1976).

As the majority notes, Philadelphia Jaycees pleaded abandonment as an affirmative defense. Although the trial court did not discuss that defense, facts were found suggesting that, at least regionally, a course of conduct may have occurred by which the mark lost its significance as an indication of affiliation with the plaintiff. It seems to me that abandonment under section 1127(a)

involves the determination of the trademark owner's intention, while section 1127(b) sets out a more objective test; what effect has the owner's course of conduct had upon the likely perception of third parties. If, by a course of commission or omission, a trademark owner has, in a given locality, created a situation in which the public is no longer likely to perceive the mark as exclusively in the owner's control, abandonment, or to put it another way, regional acquiescence, may be found. *See* R. Callman, Unfair Competition, Trademarks, and Monopolies, § 79.2 supp. 100–01 (3d Ed. 1970); Note, Abandonment as a Defense in Trade-Mark and Unfair Competition Cases, 30 Colum.L.Rev. 695, 702 & n.41 (1930). An example of regional abandonment is *Sheila's Shine Products Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir. 1973). That case focuses more on the owner's intention, however, than on the objective manifestations of his conduct.[1] It seems to me that under section 1127(b), objective manifestations of an acquiescence in regional use, and absence of the exercise of control, rather than the owner's intention, are critical. Circumstances giving rise to an estoppel afford the closest analogy. *See Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 293 F.Supp. 892 (S.D.N.Y.1965), *aff'd*, 433 F.2d 686 (2d Cir. 1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); J. Gilson, Trademark Protection and Practice § 8.12[12] (1979).

The trial court found that in Philadelphia, Jaycees denotes the Philadelphia organization, not the national organization. He found, moreover, that no legal effort to prevent use of the Jaycee mark by the Philadelphia organization occurred until five years after disaffiliation, that no rival Philadelphia chapter was started, that there was cosponsorship of a Jaycee television show, that there was continued sale of Jaycee paraphernalia, and that the parties continued to correspond. While the trial court did not proceed to relate these findings to regional acquiescence or regional abandonment, they raise for me a real question whether the burden of showing a section 1127(b) abandonment was satisfied. A remand for the trial court's view on that issue is appropriate. Thus I would vacate the judgment and remand with a direction that if the court does not find abandonment within the meaning of section 1127(b) it should enter an injunction in the form suggested by the majority. If, on the other hand, it should find regional abandonment, it should deny relief against use of the mark by the defendant in Philadelphia. In that respect, the injunction the district judge entered may have been appropriate.

---

1. *Sheila's Shine* involved an abandonment defense asserted against a common law trademark owner. While the Fifth Circuit upheld the regional abandonment concept, it also adhered to the traditional common law requirement that intent be proved, *see Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900).