**N. HESS' SONS, INC., Appellant,**

v.

**HESS APPAREL, INC., Appellee.**

**No. 82–1766.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 12, 1984.

Decided July 10, 1984.
</p>

---

Donald A. Kaul, Washington, D.C. (Peter J. Klarfeld, Brownstein, Zeidman & Schomer, Washington, D.C., on brief), for appellant.

---

J. Hardin Marion, Baltimore, Md. (John B. Isbister, Tydings & Rosenberg, Baltimore, Md., on brief), for appellee.

Before HALL and PHILLIPS, Circuit Judges, MAX ROSENN, United States Senior Circuit Judge for the Third Circuit, sitting by designation.

PER CURIAM:

In this appeal, N. Hess' Sons, Inc. (Hess Shoes) challenges as inadequately remedial an injunctive decree entered in its favor against Hess Apparel, Inc. (Apparel), which the district court found had infringed upon Hess's trademark rights in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the common law of Maryland.[1] We affirm.

Hess Shoes has, since the late 1800's, operated a number of retail stores specializing in sales of shoes and shoe-related accessories, all of which are located in the Baltimore, Maryland metropolitan trading area. Hess Shoes's stores are known by a variety of names, including "Hess," "Hess Shoes," "Hess for Her," "Hess Men's," "Hess Children's," "Current Events by Hess," "Hess Shoes Bargain Box," "Hess Stride-Rite," "Hess Running Center," and "Footgear by Hess." Although Hess stores market a wide variety of footwear items, Hess does not currently market a full line of women's apparel, and it has no intent to do so in the future. Because of extensive advertising and lengthy operations, the name "Hess" had become strongly associated with the Hess stores in the Baltimore area, specifically with the sale of shoes.

I

Hess Apparel, Inc., by contrast, has for a number of years operated full-line women's specialty clothing stores on Maryland's eastern shore and in Delaware. Although before 1981, Apparel had no store in the Baltimore area, it had acquired a substantial following there, as many Baltimoreans visited Apparel's stores during summer vacations to Ocean City, Maryland. In large part to service this following, John Hess, President of Apparel, laid plans in 1980 for opening a store in the Hunt Valley Mall (Mall) in Cockeysville, Maryland, a Baltimore suburb. Concurrently, George Hess, President of Hess, proceeded with plans to open three stores in Hunt Valley Mall that would market men's, women's and children's shoes respectively. Both firms executed leases for floorspace in the Mall in June of 1981.

Apparel opened its Hunt Valley store in September of 1981 and, contrary to John Hess's earlier representations to George Hess, began to market and advertise extensively 21 brands of shoes and an assortment of accessories, in addition to its other items of women's wear. Almost immediately, Hess Shoes objected to Apparel's use of the name "Hess" in connection with sales of shoes at the Mall. Hess Shoes documented a significant number of instances of its customers' confusing Apparel's operations with that of Hess Shoes. Ten days after opening its Hunt Valley women's store, Hess Shoes brought suit to enjoin Apparel from using the name Hess in the Baltimore metropolitan trading area.

The district court found that, prior to Apparel's entry into the Baltimore market, the name Hess had acquired a secondary meaning in connection with sale of the plaintiff's shoes, and that there was such a similarity between the names "Hess" and "Hess Apparel" that it "created a likelihood of confusion in minds of ordinary consumers," thus establishing Apparel's liability under the Lanham Act and Maryland common law.

Based on this finding of liability under the Lanham Act, the court entered an injunctive decree prohibiting Hess Apparel from selling women's shoes under the name Hess in the Baltimore area unless it chose to comply with two conditions. First, Apparel was required to state prominently

---

1. Apparel has not challenged, by way of cross-appeal, the district court's findings against it on the liability issues.

in all of its advertising for the following year that it was not affiliated with "Hess Shoes," "Hess for Her," "Current Events by Hess," "Running Center by Hess," or "Hess Bargain Box." [2] Second, it was required to display a prominent sign in its show area stating that it was not affiliated with "Hess Shoes." In addition to these alternatives, Apparel was enjoined from displaying the name "Hess" in the Baltimore area, either in connection with public displays or by way of product labels and the like, unless used in conjunction with Apparel's logo. The district court then allowed Apparel to choose between compliance with the conditions and the more severe prohibitive injunction; predictably Apparel chose the former.

## II

With these basic facts in mind, we proceed to consider Hess Shoes's principal contention on appeal, namely, that the district court abused its remedial discretion by fashioning a decree which is insufficient in law and fact to remedy the unchallenged trademark violations found. According to this contention, the decree could not be expected to have a significant ameliorative effect upon the customer confusion caused by Apparel's infringing activities and it therefore manifestly fails to accomplish the remedial purposes of the Lanham Act and its counterpart in the Maryland common law. We cannot reject the district court's decree on this basis.

█ Even in a case such as this, where the district court is affirmatively charged with effectuating the purposes of a remedial statute, its discretion in fashioning an appropriate remedy runs wide. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 141 (3d Cir.1981); *Frostie Co. v. Dr. Pepper Co.*, 361 F.2d 124 (5th Cir. 1966).

█ Where, as here, the claimed abuse of that wide discretion rests essentially on

a contention that the injunction is ineffectual to remedy a found violation, a reviewing court is hard pressed so to conclude in the absence of facts demonstrating that it is indeed ineffectual. Obviously there may be cases where the very terms of an injunction facially reveal its inadequacy to remedy a specific violation or to vindicate a specific right, but we cannot say that of this injunction. Admittedly, it appears rather mild. But its actual working is a matter dependent upon the special circumstances and context of its operation. We could find abuse in the trial judge's obvious assumption that it would work only by presuming a better knowledge of those circumstances and of that context than he gained as trier of fact. We cannot so presume on the record before us.

Events subsequent to entry of the injunctive decree might, of course, demonstrate the actual inadequacy that is now simply asserted as a necessary consequence. Nothing in this opinion precludes plaintiff from seeking relief in the form of a modified injunction based upon developments of that sort. *See* Fed.R.Civ.P. 60(b)(5). We simply have no such basis for granting that relief on the record before us.

AFFIRMED.

ROSENN, Senior Circuit Judge, dissenting.

We have before us a case in which the district court correctly found that the defendant engaged in unfair competition and service mark infringement in violation of the Lanham Act and the common law of Maryland. The violations are so conspicuous that the defendant does not even challenge them on appeal. I believe, however, that the equitable measures for relief fashioned by the district court plainly fail to remedy the wrong done by these violations. I therefore dissent.

## I.

As the district court found, the plaintiff has been selling women's shoes in the Bal-

---

**2.** This one-year period expired on July 28, 1983, at which time Hess Shoes moved for an extension of the period pending appeal. The district court denied this motion and this court denied a similar motion.

timore metropolitan area [1] for approximately a century.[2] It currently operates thirty-eight stores in Maryland, Virginia, and the District of Columbia. Although most of the plaintiff's stores are called "Hess Shoes," other names, as the majority notes, are used, each emphasizing the word "Hess." Shoe sales account for approximately ninety percent of plaintiff's more than $100,000,000 retail sales throughout the past decade. Since 1974, plaintiff has spent approximately $2,000,000 on advertising, in newspapers (e.g., *The Baltimore Sun, The Baltimore New American, The Washington Post*) and magazines (e.g., "Baltimore" and "Washingtonian") as well as on radio and television. The plaintiff also promotes its business through its participation in a wide variety of cultural and civic events in the Baltimore area.

The defendant has been operating under the name "Hess Apparel" since 1954. It currently operates eight women's specialty stores.[3] Except for the store involved in this case, defendant's establishments are clustered in a relatively small area comprising Delaware and the eastern shore of Maryland, with its principal store located in Salisbury, Maryland. In 1981, shoe sales accounted for approximately fifteen percent of defendant's $10,000,000 in retail sales. Defendant advertises primarily on the Eastern Shore, in newspapers such as *The Salisbury Daily Times, The Ocean City Beachcomber*, and *The Eastern Star Democrat*, as well as radio and television. From 1957 to 1969 and 1979 to 1981, however, defendant periodically advertised in *The Baltimore Sun.*

The families that operate and have operated these businesses are not related. Nevertheless, George Hess, president of Hess Shoes, and John Hess, president of Hess Apparel, have known each other and had been on good terms for at least a decade. They belong to several of the same organizations, including the Young Presidents Association, and share some of the same friends. For more than twenty years the parties have been aware that customers and potential customers confuse the two establishments, inquiring as to whether they are connected to each other, attempting to use one charge card to purchase goods from the other, and mistakenly returning merchandise purchased at one to the other. Sometime after 1974, George Hess and John Hess discussed the confusion, and each agreed to instruct his respective personnel to respond to such incidents by stating that although the presidents of the two companies are friends, the connection stops there.

Problems emerged in 1980, when Kravco, Inc. announced plans to build the Hunt Valley Mall in Cockeysville, Maryland, a suburb just twenty miles north of Baltimore. The Mall now has 108 stores, of which eighteen are principally devoted to shoe sales. At the time, defendant (Apparel) had no stores in the Baltimore area, and, as noted above, its stores in Maryland were clustered together on the Eastern Shore. John Hess, however, wanted to expand the business and thus met with Kravco in May 1980. Around this time plaintiff (Shoes) planned to open four shoe stores in the Mall, one each for men, women, and children, and one for athletic footwear. Plaintiff's sales in its existing Baltimore area stores had been more lucrative than sales anywhere else. George Hess sought to capitalize on the opportunity to improve plaintiff's situation and expand its markets.

By August 1980, plaintiff knew that defendant was considering and being considered for a tenancy at the Hunt Valley Mall. Plaintiff raised no objections. In April 1981, in fact, John Hess (Apparel)

---

1. The district court defined the "Baltimore area" as the City of Baltimore and Baltimore, Prince George's, Anne Arundel, Montgomery, and Carroll counties, Maryland.

2. In 1979, the Goertz Group of Germany acquired all of the capital stock of the plaintiff company.

3. One store in Dover, Delaware is operated as "Lady Hess" and another in Seaford, Delaware operates under the name of "Hess Outlet."

telephoned George Hess (Shoes) to elicit the latter's thoughts about several potential Baltimore sites for defendant. At the outset of this twenty-three minute conversation, John Hess assured George Hess that defendant's Cockeysville store *would not sell shoes*. Two months later defendant executed a lease for a store at the Mall. In July, however, when George Hess and his wife (Shoes) had dinner with John and Sue Hess (Apparel) in Ocean City, John Hess mentioned that the defendants would open a store in the Mall and would carry Pappagallo shoes, a brand that plaintiff did not carry at that time. In September, shortly before the Mall's grand opening, George Hess learned to his dismay that defendant would be carrying a wide selection of shoes. He promptly telephoned John Hess to express concern over the likelihood of customer confusion at the Mall, and confirmed the conversation with a letter stating in pertinent part:

> As I mentioned on the phone this morning, I am extremely concerned about the customer confusion that will occur as a result of your using your name in the Hunt Valley Mall beginning September 17. With the article that appeared in the Baltimore Sun, we are beginning to have comments by customers asking if we are opening an apparel store in Hunt Valley Mall.
>
> We have always had a certain amount of confusion by our customers when they have visited your store during the summer in the past, but the present situation with us both in the same shopping center would be untenable. In this regard, our plan is to keep a log in all of our stores of the comments reflecting confusion that we get. If after a reasonable length of time with our stores open and your store open we find the confusion sufficiently costly, we shall ask you to change the name of your store.
>
> The problem is compounded by the fact that you carry shoes. When we originally talked about the store you were going to open, you were not going to carry shoes. More recently you said that you would be carrying shoes that we would

not have. You know as well as I do that shoe selections change based on the season of the year and based on market demand, and there are likely to be times in the future when we will be carrying the same brands.

> As we go forward with the stores in Hunt Valley, we would appreciate your making it clear in your publicity and signs that our stores are not connected.
>
> John, I am sure you can understand our concern after having operated in this market for 109 years. We certainly don't want to do anything to jettison what we have so assiduously built.

John Hess, after consulting counsel, replied:

> This will acknowledge receipt of your letter dated 11 September 1981 which I felt should not go without comment.
>
> It is our intention to continue our past practices with respect to publicity and advertising. We have heretofore lived with the fact that our surnames are the same, and we should both continue to avoid, as far as possible, infringing on the good will that we have developed within our respective names.
>
> I should tell you that we have instructed our sales people to courteously direct to your nearest store anyone who comes to our store and inquires about Hess Shoes.
>
> I would appreciate reciprocal behavior on the part of your sales people.

The Mall indeed opened in September 1981. Since that time, defendant—who reportedly plans to open additional stores in the Baltimore area—has carried at least twenty-one brands of women's shoes, at least eleven of which are identical to those sold by plaintiff. Evidence of actual confusion abounds.

On March 8, 1982, George Hess wrote to John Hess to advise him that plaintiff would soon institute a lawsuit, stating:

> John, as I said in the letter that I wrote to you in September of 1981, we are concerned about the name we have so assiduously built up in this market for 109 years. We have had numerous incidents of confusion by customers. We

were concerned enough about it to have a public opinion poll conducted by a professional research company. The results revealed even more confusion than we thought.

Two days later, plaintiff brought this action for unfair competition and service mark infringement under 15 U.S.C. § 1125(a) (Section 43(a) of the Lanham Act) and the common law of Maryland. It simultaneously filed a motion for a preliminary injunction seeking to restrain defendant's use of "Hess" or "Hess Apparel" in the Baltimore area. Pursuant to Fed.R. Civ.P. 65(a)(2), the district court consolidated the preliminary injunction hearing with a trial on the merits, and heard the case without a jury.

On June 29, 1982, the court issued its findings of fact and conclusions of law. It found that

(1) plaintiff's name and mark had acquired secondary meaning in connection with the sale of shoes and shoe accessories in the Baltimore area prior to defendant's entry in September 1981;

(2) a likelihood of confusion existed between the two marks "largely because the defendant sells women's shoes"; and

(3) actual confusion had occurred.

Despite such findings, the court refused to enjoin the defendant from either selling women's shoes or using its mark in the Baltimore area. Instead, as the majority notes, it gave defendant a choice between ceasing altogether its sale of women's shoes in the Baltimore area or including a disclaimer in its advertising for one year and posting a similar disclaimer sign in its Hunt Valley Mall shoe department. Not surprisingly, defendant chose the latter alternative. On July 28, 1982—after denying plaintiff's request for a hearing to determine the potential effectiveness of such relief—the court entered its final decree. Plaintiff thereupon appealed. Its subsequent motion to extend the now expired advertising disclaimer period met with rejection both in the district court and in our court.

## II.

The majority wisely reminds us that, in cases such as this, we may not modify the injunction ordered by the district court merely because we would not have ordered the identical relief. Such a statement, however, does not of course mean that the district court has the untrammeled discretion to fashion relief that patently fails to remedy the violations it found. In fact, in *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 141 (3d Cir.1981), properly cited by the majority for the proposition that the district courts have considerable leeway in molding equitable relief, the court nevertheless went on to modify the district court's injunctive order because the order "render[ed] the Lanham Act protection meaningless." 639 F.2d at 145. I respectfully believe the same can be said here.

In its effort to ground its injunctive order in precedent, the district court cited three "surname" cases in which, it observed, relief "falling short of a complete bar to the use of a name" had been deemed appropriate by prior courts. The district court neglected to mention, however, that in all three cases the junior user was required both to issue a *permanent* advertising disclaimer *and* to alter its mark so as to greatly reduce the likelihood of future confusion.

In *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731 (2d Cir.1978), the Second Circuit refused to permit one Walter S. Taylor to sell wine under the "Taylor" name because of the obvious confusion that would have been generated by the junior user's apparent relationship to the famous Taylor wine company. The court thus ordered Walter Taylor and his company to either altogether refrain from the use of the word "Taylor" in its trade or to couple a permanent disclaimer with the use of the name "Walter S. Taylor."

Similarly, in *Berghoff Restaurant Co. v. Lewis W. Berghoff, Inc.,* 357 F.Supp. 127 (1973), *aff'd,* 499 F.2d 1183 (7th Cir.1974), the district court enjoined the junior user

from calling his restaurant "Berghoff" because plaintiff already had a restaurant that operated under that name, even though the restaurants were located forty miles apart. Accordingly, the court gave the infringing junior user the choice between incorporating his given name (Lewis) into the name of his restaurant in the same size lettering as that of the surname and coupling the new name with a permanent disclaimer, or altogether refraining from using the "Berghoff" name.

In *International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 712–13 (E.D.Pa.1978), *aff'd,* 595 F.2d 1212 (3d Cir. 1979), the court permitted the junior user to operate its voting machine business under the name "Ransom F. Shoup and Co." when the senior user merely called itself "Shoup Voting Machine Corporation of New York," provided that the junior user company accompany its use of the "Shoup" name with a permanent disclaimer.

Ironically, these cases—explicitly relied on by the district court—reveal the striking inadequacy of the relief it ordered. First, these cases provide no support whatsoever for the unprecedented one year limitation on the advertising disclaimer. Rather, they suggest that a disclaimer of such brief duration would serve none of the objectives of the law of unfair competition. In all likelihood, customer confusion has only been exacerbated by the on again, off again nature of this disclaimer. Equally important, these cases demonstrate the necessity of requiring the infringing junior user in a case such as this to definitely and unambiguously alter its mark. They offer no support at all for permitting a defendant to seek out a territory in which someone else already has established a secondary meaning in the name "Hess" insofar as it applies to women's shoes and accessories and use the name to sell the identical products. Rather, these cases strongly suggest that the district court should have given defendant the choice of (a) ceasing to sell women's shoes in the "Baltimore area" or

(b) substantially altering the mark of its one Baltimore area store and using a permanent disclaimer in its advertising. Because it failed to do so, I believe it erred.

Accordingly, I would vacate the decree of the district court and remand the case to it with directions to enjoin the defendant from selling women's shoes in the "Baltimore area" unless the defendant permanently alters its mark there in such fashion as will eliminate to the satisfaction of the district court the likelihood of consumer confusion in the "Baltimore area," coupled if necessary with an appropriate permanent disclaimer.[4]

---

**4.** My concern about the inadequacy of the "relief" awarded by the district court is intensified because the order effectively opens the door for the defendant to establish additional stores in the Baltimore area that feature the sale of women's shoes, thereby compounding the damage incurred by the plaintiff.